**UNITED STATES of America,**

v.

**Alan Barton NACHAMIE, et al., Defendants.**

**No. S2 98 CR. 1238(SAS).**

United States District Court, S.D. New York.

Jan. 6, 2000.

---

Lynn A. Neils, Robert R. Strang, United States Attorney's Office, Southern District of New York, New York City, for the United States of America.

Michael S. Sommer, McDermott, Will & Emery, New York City, for Jose Hernandez.

Gerald J. McMahon, New York City, for Alan Barton Nachamie.

Diarmuid White, New York City, for Edwin Tunick.

Jeremy F. Orden, New York City, for Lydia Martinez.

Steven N. Gordon, New York City, for Ghanshyam Kalani.

Richard A. Tanner, Dickson, Ashenfelter, Slous, Tanner & Trevenen LLP, Upper Montclair, NJ, for Donna Vining.

Robert S. Fink, Caroline Rule, Kostelanetz & Fink, LLP, New York City, for Kenneth Schrager.

Michael C. Miller, Fritz & Miller, P.C., New York City, for Alan Siegel.

## OPINION AND ORDER

SCHEINDLIN, District Judge.

Pursuant to Fed. R. Cr. P. 17(c), defendant Jose Hernandez has served twenty-four subpoenas *duces tecum* on non-parties in this prosecution of eight defendants for Medicare fraud.[1] The Government has moved to quash all of the subpoenas, and Hernandez opposes the Government's motion.[2]

## I. BACKGROUND

### A. The Indictment

The Indictment contains a total of twenty-six counts which are briefly summarized below. Count One alleges that all eight defendants conspired, between 1995 and June 10, 1998, to violate certain laws of the United States, to wit: Sections 1035, 1341 and 1347 of Title 18 and Sections 1320a–7b(a)(2) and 1320a–7b(a)(5) of Title 42 of the United States Code. The objects of the conspiracy are set forth in the indictment and include: (1) executing a scheme to defraud the Medicare program; (2) mailing various documents in furtherance of the scheme; (3) making false statements in connection with the delivery of and payment for health care benefits; (4) making false statements in order to obtain payments from private insurance carriers that administered the Medicare Program; and (5) presenting false claims to the Medicare program.

The Indictment charges that the claims were false in one or more of the following five ways: (1) the claimed services were never rendered; (2) different services were rendered than those that were billed; (3) services were rendered at home but were claimed to have been rendered in an office; (4) services were rendered by unsupervised non-doctors, but were claimed to have been rendered by licensed doctors or by non-doctors under the supervision of a licensed doctor; and (5) services were rendered on a single date, rather than on various dates claimed.

In a section entitled "Means and Methods of the Conspiracy," the Indictment explains how the scheme worked. Defendants Alan Barton Nachamie and Lydia Martinez[3] recruited telemarketers, who telephoned elderly people on Medicare, whose names were obtained from lists received from defendant Edwin Tunick. The telemarketers convinced these Medicare beneficiaries to agree to home visits in which diagnostic tests would be performed, for the purpose of identifying those at risk for heart attacks, strokes and Alzheimer's Disease. The beneficiaries were told the screening and testing were part of a health awareness program under the auspices of Medicare. Nachamie and Martinez then recruited foreign medical school graduates who were not licensed doctors in the United States to visit these beneficiaries at home. During these visits, the non-doctors would conduct a cursory examination and administer two basic tests—a cardiac rhythm test and a Doppler blood circulation test.

Nachamie, Tunick and Martinez also recruited licensed doctors, including defendants Ghanshyam Kalani, Donna Vining, Kenneth Schrager and Alan Siegel, to "su-

---

1. While the subpoenas were originally served *ex parte,* the Court directed that they be served on notice to the Government. Defense counsel complied with the Court's request. Three additional subpoenas were withdrawn when the subpoenaed entity became a defendant by·means of the Second Superseding Indictment (the "Indictment").

2. Several defendants, including Hernandez, have filed a number of discovery motions. Those motions will be addressed in a companion opinion to be released next week.

3. The Indictment charges that "Martinez was responsible for the activities of the telemarketers on a day-to-day basis". Indictment at ¶ 14a. ·

pervise" the non-doctors and review patient charts. These doctors rarely, if ever, met with the Medicare beneficiaries. Instead, Nachamie and Martinez provided the doctors with charts that included "Encounter Forms" indicating what tests or services had been ordered by the non-doctors and others. These doctors then signed the forms as the ordering physicians, even though they had not ordered or performed the tests or services checked off on the Encounter Forms. These Encounter Forms were sent to defendant Jose Hernandez, who submitted claims electronically to Medicare. Hernandez often received the Encounter Forms before they were signed by the doctors.

The Indictment provides three examples of services that were not performed or services that were billed in place of those that were performed. These examples are: (1) billing for an "event recorder," which permits the monitoring and recording of the heart rhythm 24 hours a day for up to 30 days, when, in reality, the patient received a one-to-two minute cardiac rhythm test; (2) billing for extensive Duplex blood circulation scans, when, in reality, the patient received a less expensive Doppler blood circulation test; and (3) billing for echocardiograms and stress tests, when, in reality, no such tests were given or were improperly given.

The Indictment specifies that the billing was done under provider numbers of different doctors and professional corporations, including three enumerated professional corporations. The indictment also alleges that defendants Nachamie, Martinez and Tunick[4] used other corporate names, of which five are enumerated. All defendants are alleged to have submitted claims to Medicare providers, who, in turn, processed the claims and sent checks to the four doctor defendants. At the di-

rection of Nachamie, Tunick and Martinez, the doctor defendants deposited the checks, keeping between 15 and 25% of the funds and writing checks for the remaining portion to the corporations used by Nachamie, Tunick[5] and Martinez. Over 10 million dollars was billed to Medicare as a result of this conspiracy.

Thirty-one overt acts are then pled in the Indictment. (1–2) In 1997, an unnamed coconspirator ("CC 1") created phony vascular reports and forged the signature of an unnamed doctor ("Doctor 1"), while that doctor was in prison. Defendant Nachamie admitted to Doctor 1 that he had ordered the preparation of the phony report and the forging of Doctor 1's signature; (3) In the Spring of 1997, CC 1 instructed another unnamed person to vary randomly the diagnostic codes in order to avoid detection by Medicare; (4) In July 1997, Nachamie and CC 1 met with an unnamed doctor in Queens, New York; (5) In 1997, Martinez fired a medical assistant who told others she suspected fraud; (6) In October 1997, Hernandez attended a meeting with Nachamie and Martinez in an office located in Newark, New Jersey; (7) In 1997, Hernandez had a meeting with Nachamie and others at an office located on Jamaica Avenue in Queens, New York; (8) In May 1997, Hernandez sent a memorandum to an unnamed coconspirator attaching sample medical reports; (9) In December 1997, Martinez interviewed a foreign medical school graduate for a job examining Medicare beneficiaries in their home; (10) In February 1998, Nachamie and Tunick met with a potential investor in Florida and Nachamie informed that person that doctors had to be changed frequently to avoid detection by Medicare; (11) On December 18, 1997, the "defendants" caused individuals to visit a beneficiary at her home in New York,

4. The Indictment specifically charges that Tunick was responsible for creating these corporations. Indictment at ¶ 14f.

5. The Indictment specifically charges that Tunick was responsible for depositing the checks and for the finances of the corporations and that he used these funds to pay the telemarketers and the foreign medical graduates who actually made the home visits. Indictment at ¶ 14j.

New York and perform various medical tests; (12) On March 25, 1998, Doctor 1 spoke with an undercover agent of the FBI; (13–17) On March 5, 1997, the "defendants" caused individuals to visit a beneficiary at his home in Bronx, New York. In March or April 1997, Dr. Kalani signed an Encounter Form for tests performed during that visit. Dr. Kalani received a check from Medicare which included the services rendered on March 25, 1997. He deposited that check and then wrote a check payable to the Flatbush Medical Practice, one of three professional corporations discussed earlier; (18–22) On May 28, 1997, the "defendants" caused individuals to visit a beneficiary at her home in Brooklyn, New York. In May or June 1997, Dr. Vining signed an Encounter Form for tests performed during that visit. Dr. Vining received a check from Medicare which included the services rendered on May 28, 1997. She deposited that check and then wrote a check payable to the Flatbush Medical Practice, one of three professional corporations discussed earlier; (23–27) On June 4, 1997, the "defendants" caused individuals to visit a beneficiary at her home in New York, New York. In June 1997, Dr. Schrager signed an Encounter Form for tests performed during that visit. Dr. Schrager received a check from Medicare which included the services rendered on June 4, 1997. He deposited that check and then wrote a check payable to the American Medical Ventures of Maryland, one of the corporations discussed earlier; (28–31) On February 16, 1998, the "defendants" caused individuals to visit a beneficiary at her home in Brooklyn, New York. In March 1998, Dr. Siegel signed an Encounter Form for tests performed during that visit. Dr. Siegel received a check from Medicare which included the services rendered on February 16, 1998. He deposited that check and then wrote a check payable to the Delta Management Corporation, one of the corporations discussed earlier.

Count Two charges all defendants with participating in a scheme to defraud Medicare in the same ways and means as described in Count One, in violation of Sections 1347 and 2 of Title 18 of the United States Code. Counts Three through Six charge Nachamie, Tunick, Martinez, Hernandez and one doctor per count of making false statements in matters involving the Medicare program, in violation of Sections 1035 and 2 of Title 18 of the United States Code. These false statements are not specified except by the five categories described above.

Counts Seven through Eleven charge Nachamie, Tunick, Martinez and Kalani with submitting false claims to Medicare, in violation of Section 1320a–7b(a)(5) of Title 42 and Section 2 of Title 18 of the United States Code. The claims are identified by date, beneficiary Medicare number and the beneficiary's first name and initial of last name (e.g. "10/96–12/96 068483868A Marie D."). Counts Twelve through Sixteen charge Nachamie, Tunick, Martinez, Hernandez and Vining with submitting false claims to Medicare, in violation of Section 1320a–7b(a)(5) of Title 42 and Section 2 of Title 18 of the United States Code. The claims are identified by date, beneficiary Medicare number and the beneficiary's first name and initial of last name. Counts Seventeen through Twenty–One charge Nachamie, Tunick, Martinez, Hernandez and Schrager with submitting false claims to Medicare, in violation of Section 1320a–7b(a)(5) of Title 42 and Section 2 of Title 18 of the United States Code. The claims are identified by date, beneficiary Medicare number and the beneficiary's first name and initial of last name. Finally, Counts Twenty–Two through Twenty–Six charge Nachamie, Tunick, Martinez, Hernandez and Siegel with submitting false claims to Medicare, in violation of Section 1320a–7b(a)(5) of Title 42 and Section 2 of Title 18 of the United States Code. The claims are identified by date, beneficiary Medicare number and the beneficiary's first name and initial of last name.

## B. The Subpoenas

The subpoenas fall into two categories—those served on doctors and those served on billing companies. The subpoenas within each category are identical. Thus the "doctor" subpoenas request the following information: [6] (1) Documents reflecting communications with Medicare during the period January 1, 1995 through June 10, 1998 (the dates of the alleged conspiracy), including, but not limited to, Explanation of Benefits reports; (2) Documents relating to communications with certain named persons or entities from January 1, 1995 to the present; (3) Documents relating to agreements between the doctor and the Government from January 1, 1995 to the present; and (4) Documents relating to communications with any third party regarding certain named persons or entities from January 1, 1995 to the present.[7]

The "billing company" subpoenas request the following information: (1) Documents relating to all communications with a specified list of individuals and entities, including, but not limited to, Current Procedural Terminology ("CPT") codes used to identify services for billing purposes, and payment records; (2) Documents reflecting communications with any third party regarding a specified list of individuals and entities; [8] and (3) Documents relating to any meetings between the billing company and a list of seven specified individuals.[9]

Finally, in his Memorandum of Law in opposition to the motion to quash, Hernandez offers to narrow the scope of the "doctor" subpoenas, if required by the Court, in the following manner: (1) narrowing the scope of the original request 1 by requesting documents relating to payment from and communications with Medicare regarding any patient for whom Medicare claims were submitted during the period January 1, 1995 through June 10, 1998, and who were contacted, examined, consulted or referred by virtue of any connection to defendants Nachamie, Tunick and Martinez; (2) adding a request for records from January 1, 1995 to date regarding communications with any billing service used by the doctor or any entities controlled by the doctor; (3) narrowing the scope of the original request 2 by requesting documents relating to communications with seven individuals and one entity (rather than seven individuals and twenty-one entities); and (4) eliminating the request for agreements between the doctors and the Government but substituting a

6. The requests are not quoted *verbatim* but are merely summarized. The wording of the actual subpoenas is broader than that indicated by the summary. It is for this reason that the proposed narrowed version of the subpoenas is also summarized.

7. The entities named in requests 2 and 4 include the defendants Hernandez, Martinez, Nachamie and Tunick, all but one of the entities identified in the Indictment as corporations set up by some of those defendants, billing companies used by those defendants to submit bills to the Medicare program, ten entities with whom Hernandez had contact, and three individuals who allegedly worked with the non-doctor defendants. Those three individuals were identified in the original Complaint, dated June 10, 1998 (the "Complaint"). Andrew Messana, who was represented to be pathologist, but turned out to have a revoked chiropractor's license, helped the non-doctor defendants recruit doctors. *See* Complaint at ¶¶ 8c, 9d, 14. Saverio Sen-

ape, whose medical license had been revoked, helped the non-doctor defendants process the documentation. *See* Complaint at ¶¶ 8e, 12f, 21, 22. Imran Aziz Shaikh, who identified himself as an attorney, recruited doctors and coordinated the processing of the payments from Medicare. *See* Complaint at ¶¶ 7, 8, 9, 12g.

8. The individuals and entities named in requests 1 and 2 are identical to those described in the previous footnote, except that the individuals and entities named in requests 1 and 2 do not include the billing companies used by defendants Hernandez, Martinez, Nachamie, and Tunick to submit bills to the Medicare program.

9. This list includes defendants Hernandez, Martinez, Nachamie and Tunick, as well as Messana, Senape, and Shaikh, the three individuals who allegedly worked with the non-doctor defendants.

request for any oral and written materials presented to the Government in connection with possible civil and criminal charges.

## II. DISCUSSION

### A. Standing

■ A party generally lacks standing to challenge a subpoena issued to a third party absent a claim of privilege or a proprietary interest in the subpoenaed matter. *See United States v. Reyes,* 162 F.R.D. 468, 470 (S.D.N.Y.1995)(citing *Langford v. Chrysler Motors Corp.,* 513 F.2d 1121 (2d Cir.1975)(absent claim of privilege, party usually has no standing to object to subpoena directed at non-party); *In re Grand Jury Subpoena Duces Tecum Dated May 9, 1990,* 741 F.Supp. 1059, 1060 n. 1 (S.D.N.Y.1990)(same), *aff'd,* 956 F.2d 1160 (2d Cir.1992); *Ponsford v. United States,* 771 F.2d 1305, 1308 (9th Cir.1985) (absent proprietary interest in documents sought, no standing to quash)). *See also United States v. Tomison,* 969 F.Supp. 587, 596 (E.D.Cal.1997). Nonetheless, the Government asserts that it has standing to quash Hernandez' Rule 17(c) subpoenas based on two theories. The Government's first theory is that it has an interest in preventing an undue lengthening of the trial, undue harassment of its witnesses and any prejudicial over-emphasis on its witnesses' credibility. In support of this theory the Government cites to *United States v. Chen De Yian,* 94 Cr. 719, 1995 WL 614563 (S.D.N.Y.1995); *United States v. Orena,* 883 F.Supp. 849 (E.D.N.Y.1995); and *United States v. Giampa,* 92 Cr. 437, 1992 WL 296440 (S.D.N.Y.1992). The Government's second theory is that it has been asked to act on behalf of several of the subpoena's recipients, whom it has identified to the Court *ex parte.*[10]

### 1. Does the Government have standing based on its own interest?

■ The Government's argument that it has standing based on its own interest is unavailing. A close reading of the cases relied on by the Government reveals that individually each is distinguishable from this case and collectively they may have created a misunderstanding of the concept of standing to quash a Rule 17(c) subpoena. In the earliest of the three cases, *United States v. Giampa, supra,* defense counsel served Rule 17(c) subpoenas on three trial witnesses, all of whom were then in the Witness Protection Program. On behalf of its witnesses, the Government accepted service of these subpoenas, which were made returnable on the first day of trial and called for what the court unequivocally described as "impeachment" materials. The court concluded that the Government had standing to quash these subpoenas because the "subpoena infringe[d] upon the movant's legitimate interests". *United States v. Giampa,* 1992 WL 296440, at *1 (quoting *United States v. Raineri,* 670 F.2d 702, 712 (7th Cir. 1982)) (citing *In re Grand Jury,* 619 F.2d 1022, 1027 (3d Cir.1980)). The legitimate interests raised by the Government included preventing undue lengthening of the trial, undue harassment of the three witnesses, and prejudicial over-emphasis on the witnesses' credibility. The court particularly noted that, because the witnesses were in the Witness Protection Program, the "Government has a heightened interest in shielding all of these individuals from potential undue harassment." *Giampa,* 1992 WL 296440, at *1.[11]

The problem with *Giampa*'s analysis is its concept of the "movant's legitimate interests". The *Giampa* court cited *Rain-*

**10.** During an *ex parte* telephone call, the Assistant U.S. Attorney informed the Court that six identified recipients had asked that the Government move on their behalf to quash the subpoenas. The Government conceded that the other recipients had not made this request.

**11.** It is noteworthy that the court eventually denied the motion to quash and permitted the requested documents to be produced, but only when the witness testified at trial. *See Giampa,* 1992 WL 296440, at *2–*4.

*eri, supra,* as the touchstone for this concept. *Raineri,* however, involved a very different situation than the one at issue in *Giampa* or the one at issue here. In *Raineri,* the prosecution called a Ms. Gasbarri as its first witness. The defense counsel then used a trial subpoena to compel her appearance as a defense witness, and the Government moved to quash this trial subpoena. The court found that the Government had standing to quash because the subpoena infringed on its legitimate interest in "preventing undue lengthening of the trial, undue harassment of its witness, and prejudicial overemphasis on [the witness'] credibility." *United States v. Raineri,* 670 F.2d at 712. Unlike in *Giampa* or in this case, the Government's legitimate interest in *Raineri* involved preventing a redundant and time-consuming reexamination of a witness who had already been subjected to a lengthy and effective cross-examination.

*Raineri,* in turn, relied on *In re Grand Jury, supra.* That case involved the Government's use of a grand jury subpoena, not a Rule 17(c) subpoena, to compel testimony from six employees of a Philadelphia brewer. The brewer moved to quash the subpoenas, arguing that the grand jury process was abused because it was not investigating any federal crime. The Government argued that the brewer had no standing to quash the subpoena of the employees, but the court held that the brewer had standing, referring specifically to the brewer's property interest in both its books and records and the services of its employees. The court then went further, holding that standing to quash a grand jury subpoena must extend beyond the concepts of "privilege" and "property":

> Third party standing to assert claims of grand jury abuse cannot be determined by categorizing the claimed interest as one of property or privilege, but only by examining the nature of the abuse, and

asking whether, and in what manner, it impinges upon the legitimate interests of the party allegedly abused.

*In re Grand Jury,* 619 F.2d at 1027. This sound jurisprudence has no application in the context of Rule 17(c) subpoenas, particularly in the absence of a unique circumstance such as the harassment of a peculiarly vulnerable witness—e.g., one who is in the Witness Protection Program.

In the second case relied on by the Government, *United States v. Orena, supra,* defense counsel subpoenaed records from the accountant of a government witness. The case involved the prosecution of defendants allegedly aligned with a faction of an organized crime family for conspiring to murder members of a rival faction and for using and carrying firearms during and in relation to crimes of violence. The Government moved to quash the subpoena and the defendant challenged the Government's standing to do so. Relying solely on the authority of *Giampa, supra,* and without further analysis, the court held that because the subpoena might unduly lengthen the trial and unduly harass the witness and his family, the Government had standing.[12] Unlike the case at hand, however, *Orena* involved a crime of violence and the real potential for danger to its witnesses.

The final case relied on by the Government, *United States v. Chen De Yian, supra,* is the most easily distinguished. There, defense counsel subpoenaed records from a sheriff's office with respect to its earlier investigation of certain murders, for which the defendant had been charged in federal court. The Government moved to quash the subpoena and the court found that the Government had standing to do so for two reasons. *First,* the sheriff's office had produced all of the requested materials to the U.S. Attorney's Office, which the court construed as a request that the Government move to quash on its behalf. *Sec-*

---

12. Once again, the court ultimately denied the motion to quash, holding that the subpoenaed material should be produced but only at the time the witness actually testified at trial. *See Orena,* 883 F.Supp. at 869.

*ond,* the court accepted the principle that a party has standing to move to quash a subpoena addressed to a third party if the subpoena infringes on a legitimate interest of the party moving to quash. In *Chen De Yian,* the court found that the Government's legitimate interest was in protecting its work product.[13]

In short, the Government has not asserted a legitimate interest in quashing these subpoenas. Unlike the subpoenaed entities in the cases discussed above, none of the doctors and billing companies subpoenaed here have been publicly identified by the Government as trial witnesses, or as particularly vulnerable witnesses, and they are not witnesses or potential witnesses in a case involving grave violence or threats of violence. In addition, the materials sought have not been produced to the Government, in total, by the non-parties in furtherance of their obligation to respond to these subpoenas. Finally, the materials sought by the subpoenas do not consist of Government reports and were not prepared by Government officials. While the Government may have collected some of the responsive documents in its own investigation, it cannot and does not claim any work product privilege in these documents. The Government, of course, does not claim any other privilege or proprietary interest in these documents.

The language in *Raineri,* that the Government has a legitimate interest in "preventing undue lengthening of the trial, undue harassment of its witness, and prejudicial overemphasis on [the witness'] credibility," *Raineri,* 670 F.2d at 712, cannot be applied uncritically. The documents sought by Hernandez were created by and belong to the parties from whom they were subpoenaed. If the Government had standing to move to quash whenever a subpoena was served on a potential witness, then it could move to quash virtually every Rule 17(c) subpoena

merely by claiming that the recipient might become a witness. Surely, the concept of standing was not meant to be so elastic.

## 2. Does the Government have standing as a representative of the subpoenaed doctors?

■ The Government's argument that it has standing as a representative of the subpoenaed doctors has slightly more appeal. In an *ex parte* communication with the Court, the Government informed the Court that in addition to Dr. Gerardo Camejo, whose attorney appeared in court and joined in the Government's motion to quash, four other doctors or their attorneys wrote to the Government asking to join in the motion to quash. According to the Assistant U.S. Attorney these doctors did not proceed on their own behalf because they were reluctant to reveal that they had agreed to be Government witnesses. One other attorney orally requested that his or her client, another doctor, be permitted to join in the Government's motion for the same reason raised by the other doctors. As to these six doctors, the Government asks that it be permitted to stand in their shoes and assert their rights to quash the subpoenas. None of the billing company recipients requests the government's assistance.

As noted earlier, this argument has an initial appeal because the Government is not asserting its own standing but rather is attempting to act on behalf of its witnesses. Nonetheless, this too is insufficient to grant the Government standing to move to quash the subpoenas. First, the Government has not represented that each of these doctors produced all of the subpoenaed materials to it. *See Chen De Yian,* 1995 WL 614563, at *2. In addition, the Government cannot undertake to act as counsel to its witnesses. If a Government witness needs counsel, and cannot

---

**13.** The court also held that the subpoenas should be quashed because Fed. R. Cr. P. 16(a)(2) barred discovery of reports generated by local law enforcement agents and because it amounted to a general "fishing expedition." *Chen De Yian,* 1995 WL 614563, at *2.

afford to retain his or her own counsel, the Court would consider the appointment of counsel. But the Government's interests and that of its witnesses are not identical and it would therefore be inappropriate for the Government's attorney to act as counsel to its witnesses.

If the motivation of these doctors in not moving on their own behalf to quash was to protect their identities as Government witnesses, they could have filed an *ex parte* motion to quash. While the Court would then decide if there was a need to hear the motion *ex parte*, the doctors would have done their best to avoid disclosure which, in the absence of pleas by all defendants, is inevitable. Given the "white collar" nature of these charges, there is no reason to conclude that their identification as witnesses would pose any danger. Thus, the Government may not move to quash the subpoenas in this case on behalf of its witnesses or potential witnesses.

## B. The Merits

### 1. The legal standard

■ Although the Government lacks standing to quash the subpoenas, the attorney for one of the doctors has objected to the subpoena served on his client. *See* Transcript of Dec. 22, 1999 Hearing ("Dec. 22 Tr.") at 25–26. In addition, before a court issues a Rule 17(c) subpoena, it must be satisfied that the subpoena complies with the requirements of the Rule. *See Tomison*, 969 F.Supp. at 594 ("As the Supreme Court has explained, it is the responsibility of the court, not the opposing party, to ensure that a subpoena secured under Rule 17(c) is for a proper purpose.") (citing *Bowman Dairy Co. v. United States*, 341 U.S. 214, 221, 71 S.Ct. 675, 95 L.Ed. 879 (1951)). For both these reasons, I now analyze the merits of Hernandez' subpoenas.

Rule 17(c) provides in pertinent part:

The court may direct that books, papers, documents or objects designated in the subpoena be produced before the court at a time prior to the trial or prior to the time when they are to be offered in evidence and may upon their production permit the books, papers, documents or objects or portions thereof to be inspected by the parties and their attorneys.

Fed. R. Cr. P. 17(c). It has become accepted jurisprudence that Rule 17(c) is not intended to provide "a means of discovery for criminal cases...but to expedite the trial by providing a time and place before trial for the inspection of subpoenaed materials." *United States v. Nixon*, 418 U.S. 683, 698–99, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974). However, a brief history of the development of the Rule and its interpretation by the courts is instructive for resolving the issue at hand.

Rule 17(c) was adopted as part of the Federal Rules of Criminal Procedure in 1944 and has not been amended. The Advisory Committee Note states "[t]his rule is substantially the same as rule 45(b) of the Federal rules of Civil Procedure." Fed. R. Cr. P. 17(c), Advisory Committee Notes, 1944 Adoption. Rule 45(b) permitted parties in a civil action to obtain discovery from non-parties by way of a subpoena. Discovery from a party, as opposed to a non-party, was and is governed by Rules 26–37 of the Federal Rules of Civil Procedure. This brief history may indicate that the drafters initially thought that Rule 17(c) governed discovery from non-parties, while Rule 16 governed discovery from the Government.

Defense counsel, however, typically used Rule 17 as a means of obtaining discovery from the Government, as well as from non-parties. In *Bowman Dairy, supra*, the Supreme Court addressed Rule 17(c) in the context of such a subpoena. There, defense counsel served a Rule 17(c) subpoena on the Government seeking all of the documents gathered by the Government in its investigation, including documents the Government intended to introduce at trial. These materials included documents supplied by third parties to the Government during the grand jury investigation. The

Government moved to quash the subpoena on the ground that "the access of a defendant in a criminal proceeding to materials in custody of Government attorneys is limited to rights granted by Rule 16. . . ." *Id.* at 217, 71 S.Ct. 675. The Court rejected that argument, holding that a defendant could obtain materials from the Government so long as such material is considered "evidentiary". "No good reason appears to us why they [the documents] may not be reached by subpoena under Rule 17(c) as long as they are evidentiary." *Id.* at 219, 71 S.Ct. 675. Despite the fact that the Court enforced the subpoena for some of the Government's documents, it wrote:

> It was not intended by Rule 16 to give a limited right of discovery, and then by Rule 17 to give a right of discovery in the broadest terms. . . . Rule 17(c) was not intended to provide an *additional* means of discovery.

*Id.* at 220, 71 S.Ct. 675 (emphasis added).[14] Because *Bowman Dairy* dealt with a subpoena to the Government, and thereby raised the issue of distinguishing between the scope of Rules 16 and 17, the Court did not consider Rule 17(c) in the context of discovery from non-parties, the very focus of the original Advisory Committee Note that referred to Fed.R.Civ.P. 45.

Twenty-three years later, in 1974, the Supreme Court again had occasion to address a Rule 17(c) subpoena. In *United States v. Nixon*, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974), the subpoena was issued by the Government and sought records from a non-party, specifically the President of the United States. The text of Rule 17(c) provides that "[t]he court on motion made promptly may quash or modify the subpoena if compliance would be unreasonable or oppressive." Fed. R. Cr. P. 17(c). The Rule itself provides no other basis to quash a subpoena. Nonetheless, citing *Bowman Dairy's* requirement that the subpoena seek "evidentiary" material, the Supreme Court adopted the four-part test for determining what is "evidentiary" set forth in *United States v. Iozia*, 13 F.R.D. 335, 338 (S.D.N.Y.1952) (Weinfeld, J.).[15] The Court then concluded with the simple test a party must meet to enforce a subpoena: "(1) relevancy; (2) admissibility; (3) specificity." *United States v. Nixon*, 418 U.S. at 700, 94 S.Ct. 3090.

That high standard, of course, made sense in the context of a Government subpoena, especially one seeking evidence from the President. It must be recalled that the Government's use of a subpoena occurs *after* the completion of a grand jury investigation. Indeed, the Supreme Court has held that "the *Nixon* standard does not apply in the context of grand jury proceedings. . . ." *United States v. R. Enterprises*, 498 U.S. 292, 299–300, 111 S.Ct. 722, 112 L.Ed.2d 795 (1991). A real question remains as to whether it makes sense to require a defendant's use of Rule 17(c) to obtain material from a non-party to meet this same standard.[16] Unlike the Government, the defendant has not had an

---

**14.** Rule 16 was amended in 1966, following *Bowman Dairy*, and now permits the defense to obtain materials from the Government (such as statements of the defendant) that it could not previously obtain, except by subpoena. *See* Fed. R. Cr. P. 16, Advisory Committee Notes, 1966 Amendment.

**15.** "Under this test, in order to require production prior to trial, the moving party must show: (1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general 'fishing expedition.' " *United States v. Nixon*, 418 U.S. at 699–700, 94 S.Ct. 3090.

**16.** In *Nixon*, the Supreme Court explicitly avoided answering this question, whether the requesting party is the defendant *or* the Government: "The Special Prosecutor suggests that the evidentiary requirement of *Bowman Dairy Co.* and *Iozia* does not apply in its full vigor when the subpoena duces tecum is issued to third parties rather than to government prosecutors. We need not decide whether a lower standard exists because we are satisfied that the relevance and evidentia-

earlier opportunity to obtain material by means of a grand jury subpoena. Because the Rule states only that a court may quash a subpoena "if compliance would be unreasonable or oppressive," the judicial gloss that the material sought must be evidentiary—defined as relevant, admissible and specific—may be inappropriate in the context of a defense subpoena of documents from third parties. As one court has noted,

> The notion that because Rule 16 provides for discovery, Rule 17(c) has no role in the discovery of documents can, of course, only apply to documents in the government's hands; accordingly, Rule 17(c) may well be a proper device for discovering documents in the hands of third parties.

*Tomison,* 969 F.Supp. at 593 n. 14. If this is so, then the only test for obtaining the documents would be whether the subpoena was: (1) reasonable, construed using the general discovery notion of "material to the defense;" and (2) not unduly oppressive for the producing party to respond.

**2. Application of the standard to these subpoenas**

Under either the standard laid out in *Nixon* or the standard contained in Rule 17(c) itself, the Government's motion to quash these subpoenas is, with one exception, denied. I shall begin with the "doctor" subpoenas and then turn to the "billing company" subpoenas.

**a. The "doctor" subpoenas**

█ Defendant Hernandez provided billing services to each of the doctors on whom he served subpoenas. The first three requests in his narrowed subpoena (*see* p. 558, *supra*) seek (1) all communications with Medicare regarding patients referred by co-defendants during the time period of the alleged conspiracy; (2) records of communications with any billing service used by the doctor or by entities controlled by the doctor; and (3) records

of communications with seven identified individuals, all of whom are named in the Indictment or Complaint, and one entity, from 1995 to the present.

These subpoenas satisfy the three part-test laid out in *Nixon* because they make specific requests for relevant and admissible documents. The requested records, which consist of business records of either the doctors or the Medicare program, or possible statements of co-conspirators, are relevant to the issues of knowledge and intent, because they reveal the work done by Hernandez on an ongoing and regular basis, or the work done by similarly situated billing companies, or the interaction between the doctors, the billers, and the alleged co-conspirators. The requests, as narrowed, are specific, both with respect to time frame and the identity of particular records relating to the charges in this Indictment, because the requests focus on patients referred by co-conspirators, relations with similarly situated billing services, and communications with the alleged co-conspirators. Finally, the requested records are likely to be admissible.

The subpoenas also satisfy the four-part *Nixon* text. *First,* the requested records are evidentiary and relevant, for the reasons explained above. *Second,* the requested records are not "otherwise procurable reasonably in advance of trial." While the Government argues that it has produced many of the requested documents and contends that this request is therefore an "end run" around Rule 16(a)(1), this is simply not so. The Government has produced voluminous records, as will be discussed further below. However, the Government does not and cannot represent that it has produced all of the records called for in the subpoenas. Furthermore, the Government's production may not be organized in the same manner as the records are maintained by the subpoenaed doctors. Hernandez is entitled to seek these third-party records from the

---

ry nature of the subpoenaed tapes were sufficiently shown as a preliminary matter to warrant the District Court's refusal to quash the

subpoena." *Nixon,* 418 U.S. at 700 n. 12, 94 S.Ct. 3090.

third parties, who are the proprietors of those records. *Third*, Hernandez cannot reasonably prepare for trial without inspecting these materials and the failure to inspect these documents may "unreasonably delay the trial". *Fourth*, I conclude that this application is made in good faith and is not a "fishing expedition."

Finally, the subpoenas satisfy the standard contained in Rule 17(c) itself. Given the absence of objections from all but one doctor, I cannot find that these requests are unduly oppressive. Indeed, the one doctor who did object said that the records were not voluminous. *See* Dec. 22 Tr. at 33. In addition, the request is reasonable because these records, which are relevant to the issues of knowledge and intent, are material to Hernandez' defense.

■ There is one exception, however. In his fourth request Hernandez seeks documents relating to materials presented to the Government, whether oral or written, "in connection with any request of dialogue concerning the question of whether criminal or civil charges would be brought against you by the United States Attorney's Office for the Southern District of New York." Hernandez Memorandum of Law at Appendix p. 2. This request is improper. These materials, if they exist, may contain privileged work product and may constitute impeachment material rather than evidence. *See Nixon*, 418 U.S. at 701, 94 S.Ct. 3090 ("Generally, the need for evidence to impeach witnesses is insufficient to require its production in advance of trial."); *United States v. Cherry*, 876 F.Supp. 547, 553 (S.D.N.Y.1995). Such material should not be produced in advance of the witness' testimony unless it includes *Brady* material, in which case the Government will undoubtedly produce it. Thus, the Government's motion to quash is granted as to the fourth request in these subpoenas, but denied as to the first three requests.

### b. The "billing company" subpoenas

■ These four subpoenas, which were served on billing companies servicing the alleged co-conspirators both before and after Hernandez supplied billing services, satisfy both *Nixon* and Rule 17(c) for many of the reasons described above. Looking first to the three-part test in *Nixon*, Hernandez established, in an *ex parte* proffer to the Court, that the materials sought in these subpoenas are relevant and admissible. Without revealing the substance of the communication, which was properly communicated *ex parte* because it related to trial strategy, the short answer is that these materials are relevant to the issue of intent. Because the documents primarily seek business records, they are at this early stage likely to be admissible at trial. However, they are not sufficiently specific in the following ways: (1) they lack a specific time frame; and (2) the language "All correspondence and other documents, including but not limited to documents reflecting, discussing, or relating" is overbroad and smacks of a fishing expedition. Nonetheless, if these defects are cured, i.e. if the time frame is narrowed and the requested documents are identified with the specificity of the narrowed "doctor" subpoenas, then these subpoenas will satisfy the three-part test in *Nixon*.

With the modifications described above, the subpoenas also will satisfy the four-part test laid out in *Nixon*, for the same reasons discussed above in the Court's analysis of the "doctor" subpoenas. Finally, the modified subpoenas will meet the Rule 17(c) standard, because the requested information is material to Hernandez' defense and no recipient has alleged that producing the information will be unduly oppressive.

### III. CONCLUSION

For the reasons set forth above, the Government's motion to quash the subpoenas is granted in part and denied in part.

SO ORDERED: