UNITED STATES of America, Plaintiff,

v.

Joseph SMITH, et al., Defendants.

No. 1:06–CR–00384.

United States District Court,
N.D. Ohio,
Eastern Division.

June 14, 2007.

Carole S. Rendon, Giffen & Kaminski, Cleveland, OH, Michael R. Hamed, Kushner & Hamed, Cleveland, OH, Philip S. Kushner, Kushner & Hamed, Cleveland, OH, Robert J. Rotatori, J. Scott Broome, Richard L. Stoper, Susan L. Gragel, Rotatori, Bender, Gragel, Stoper & Alexander, Cleveland, OH, for Defendants.

## MEMORANDUM AND ORDER

ANN ALDRICH, District Judge.

Before the court are three motions: (1) defendant Joseph Smith's ("Smith") motion to compel production [Docket No. 37]; (2) plaintiff United States of America's (the "Government") motion to quash subpoenas issued by defendant Anton Zgoznik ("Zgoznik") [Docket No. 43]; and (3) the Catholic Diocese of Cleveland's (the "Diocese") motion to quash subpoenas [Docket No. 49]. The Diocese also includes interested parties Bishop Anthony Pilla ("Bishop Pilla"), the Catholic Cemeteries Association (the "CCA") and the Catholic Universe Bulletin (the "Bulletin"). In a March 6, 2007 order [Docket No. 45] following a status conference, the court directed Smith to file a proposed subpoena with respect to the documents sought by his motion to compel, to be followed by a response brief from the Diocese and a reply brief from Smith. For the following reasons, the court grants Smith's motion to compel in part, denies the motions to quash, and orders production as described.

## I.

### A. Factual Background

The indictment [Docket No. 1] charges Smith and Zgoznik with one count of conspiracy to commit mail fraud and eight counts of mail fraud, and charges Smith with eight counts of money laundering, along with ten other tax-related counts.[1] Those charges relate to alleged acts by Smith and Zgoznik while Smith was employed by the Diocese. The Diocese vests authority over its financial and legal affairs in the Financial and Legal Office (the "F & L Office"), headed by the Financial and Legal Secretary ("F & L Secretary"), who is supervised by the bishop and auxiliary bishops. The F & L Secretary is advised by a committee, presided over by the bishop or the bishop's representative and consisting of lay people appointed by the bishop. The advisory committee had the power to approve certain Diocese expenditures, and generally advised the F & L Secretary and the bishop on financial matters. The CCA is a separate entity from the Diocese, but its operations were supervised by the F & L Office.

Smith was employed by the Diocese in the F & L Office from the early 1980s through February 17, 2004. He held the position of Treasurer, then Chief Financial Officer ("CFO"), supervising the Diocese Finance Office under the F & L Secretary's supervision. In 2000, Smith was promoted to the position of F & L Secretary, retaining his position as CFO. Smith is both a licensed attorney and an accountant. Upon promotion to F & L Secretary, Smith's compensation was determined annually by the bishop, on recommendation from the financial advisory committee. Smith also owned and operated Tee Sports, Inc. ("Tee Sports"), which sold golf equipment and organized golf outings. Smith told the Diocese that he conducted Tee Sports business mostly from his home in the evening and on weekends. Smith also did business under the name JHS Enterprises ("JHS"), maintaining a separate bank account in that name.[2]

Zgoznik worked for the Diocese as an independent contractor from October 1995 through January 1997, and was a Diocese employee from February 1997 through January 1999. He served as Assistant Treasurer. From February 1999 through the end of 2003, Zgoznik continued to work as Assistant Treasurer, though on a contract basis instead of being a Diocese employee. From October 1996 through December 2003, Zgoznik owned and/or operated a number of companies that provided accounting, tax, financial and computer services to the Diocese and related organizations. Those companies are: (1) ZJ & Associates, later renamed Institutional Financial Advisors, Inc. ("ZJA/IFA"); (2) Institutional Business Solutions, Inc. ("IBS"), which had formerly been known as Monastra & Associates, Inc. and Zgoznik & Associates, Inc.; and (3) Alexander Systems Group ("ASG"), later renamed Zgoznik and Associates, Inc. In early 2003, Zgoznik began using IBS to perform work originally performed by ZJA/IFA; he ceased using ZJA/IFA.

### B. The Kickback Scheme

The Government alleges that, from early 1996 through December 2003, Smith caused certain Diocese offices and departments, along with the CCA and other Diocese-affiliated or controlled organizations, to hire ZJA/IFA, IBS and ASG (the "Zgoznik Entities") to provide accounting, computer, financial and other services. From 1996 through 2003, approximately $17.5 million was paid to the Zgoznik Entities for services provided. The Government claims that from June 1997 through February 2004, Smith arranged for Zgoznik to be hired for various services in exchange for kickback payments paid to Smith, which Smith did not report to the Diocese, and that Zgoznik charged more for the services provided than he would have otherwise, to pay for the kickbacks to Smith. The Government also claims that the two hid the kickback payments by having the Zgoznik Entities write checks payable to the Smith Entities, for purported services per-

---

[1.] The tax-related counts are one count of conspiracy to defraud the Internal Revenue Service ("IRS") and one count of corruptly endeavoring to obstruct/impede against both Smith and Zgoznik, four counts of making a false tax return

against Smith, and four counts of aiding/assisting preparation of a false return against Zgoznik.

[2.] Tee Sports and JHS shall be referred to collectively as the "Smith Entities".

formed by the Smith Entities, paying a total of just over $500,000 to JHS and just over $284,000 to Tee Sports from 1997 through 2003, for a total of $784,627.25. The Smith Entities allegedly never performed the services for which they were paid by the Zgoznik Entities. Finally, the Government also claims that Smith deposited the kickback payments from the Zgoznik Entities into an account opened for Tee Sports, but which Smith used as a personal account.

In early 2004, in response to inquiries from the Diocese, the Government claims that Smith and Zgoznik lied to conceal the kickback arrangement—Zgoznik by concealing the arrangement and Smith by representing that the Zgoznik Entities' payments to the Smith Entities were for actual services rendered.

### C. The Other Schemes

#### 1. The Fidelity Account Scheme

In March 1996, Smith and the then F & L Secretary, Father John Wright ("Father Wright"), made an arrangement where Smith would be paid a substantial lump-sum in addition to his regular salary so Smith would remain a Diocese employee instead of leaving for the private sector. The understanding allegedly was that the lump-sum was in lieu of any raises for the next five years, save for cost-of-living adjustments. The Government claims that Zgoznik participated in the arrangement by helping to convince the F & L Secretary to agree, and by helping to transfer the funds.

In order to put the arrangement into effect, an account was opened at Fidelity Investments using the Diocese's tax-identification number and was called the D.O.C. Special Administration account (the "Fidelity Account"). Smith and the F & L Secretary were the ones authorized to use the account, using Smith's home address as the mailing address. The account was opened with a $185,000 deposit in April 1996. The Government claims that Smith and Zgoznik somehow caused another $85,000 to be deposited in that account in August 1997 by Diocese check. The $270,000 total in the Fidelity Account was not entered as compensation for Smith on Diocese records, and was not reported to the IRS as in-

come. The Government claims Smith used the Fidelity Account as a personal investment account, purchasing and selling stocks and other securities and withdrawing funds from the account for personal use up until August 2002, when the Fidelity Account was mostly emptied. The Government alleges that Smith reported none of the funds, or the capital gains/dividends/other income generated by investment of the funds in the account, as income.

#### 2. The CCA Scheme

The Government alleges that in January of 1997, 1998, 1999 and 2000, Smith caused Diocese funds to be paid to him, indirectly, by checks from the CCA payable to JHS, without authorization from the Diocese. The checks—$12,500 in 1997 and $15,000 in each of the other three years—were recorded by the CCA as being for executive and professional services. The Government claims that following the checks from CCA to JHS, Smith caused the Diocese Financial Office to issue checks in the same amount, payable to the CCA, which were recorded by the Diocese as reimbursement of the yearly fee/administrative tax the Diocese charged the CCA for services. The Government claims that Smith failed to report these payments as income on his federal income tax returns.

#### 2. The Insurance Scheme

The Government also claims that Smith arranged for the Diocese to retain the Cleveland office of an insurance brokerage firm to provide insurance consulting services and to obtain insurance coverage in certain cases. The Government also alleges that Smith, from May 1994 through December 2000, received monthly kickback payments from the insurance firm by checks payable to JHS. The payments were recorded by the insurance firm as for consulting services that Smith never provided through May 1998, and thereafter recorded as payments by the insurance firm to lease property owned by Smith, even though the firm never used the property. The Government claims that Smith failed to report these payments as income on his federal tax returns.

## D. Overlap of Proof

According to the indictment [Docket No. 1], only the Kickback Scheme is the subject of mail fraud and money laundering charges. The only charges arising out of the other three schemes are tax-related charges. However, based on interview reports provided by the Government to the defendants, it appears that Bishop Pilla will testify that (a) no one, not even Father Wright, had the power to approve payments such as the one involved in the Fidelity Account scheme, and by extension, the Kickback Scheme, and (b) the Diocese's financial affairs were run in such a way that there were no alternative ways of paying compensation like the Fidelity Account scheme, and by extension, the Kickback Scheme. Father Wright is expected to testify that he did approve the extra $270,000 in compensation to Smith at issue in the Fidelity Account scheme—which is why Smith is not being charged with mail fraud or money laundering with respect to that scheme—but did not authorize the $784,000 at issue in the Kickback Scheme. The Government, in opposing the defendants' motions to sever, asserted that the questionable conduct involved in the Fidelity Account, Insurance and CCA schemes helps to show that the defendants' conduct in the Kickback Scheme was fraudulent or unlawful and therefore illegal.

The defendants claim that the documents they seek oppose Bishop Pilla's assertion that the Diocese's finances were run completely above-board, oppose Bishop Pilla's assertion that not even Father Wright had the power to authorize extra compensation in alternative ways, oppose Father Wright's assertion that he was duped concerning the $784,000 in the Kickback Scheme, and oppose the Government's argument that the "questionable conduct" in the other schemes helps to show fraudulent or unlawful conduct in the Kickback Scheme. The defendants' position is that while the evidence sought would cast doubt on the credibility of Bishop Pilla, Father Wright and the Diocese, it *also* and *primarily* serves to rebut the factual assertions Bishop Pilla and Father Wright make—that the Kickback Scheme could not have been authorized, was not authorized, and was not similar to common, questionable practices used by the Diocese.

## II.

### A. Applicable Law

Rule 17 of the Federal Rules of Criminal Procedure governs the Diocese's obligations to disclose or produce, or more accurately, the court's power to compel disclosure or production. Rule 17(c)(1) allows a subpoena to "order the witness to produce any books, papers, documents, data, or other objects the subpoena designates," and Rule 17(c)(2) permits the court to "quash or modify the subpoena if compliance would be unreasonable or oppressive." Production under Rule 17(c) is justified where: "(1) the documents are evidentiary and relevant; (2) they are not otherwise procurable, with due diligence, in advance of trial; (3) the party cannot properly prepare for trial without such production and inspection in advance of trial; and (4) the application was made in good faith and is not a fishing expedition." *United States v. Hughes,* 895 F.2d 1135, 1146 (6th Cir.1990) (citing *United States v. Nixon,* 418 U.S. 683, 699, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974)). However, "'the need for evidence to impeach witnesses is insufficient to require its production in advance of trial.'" *Id.* (citing *Nixon,* 418 U.S. at 701, 94 S.Ct. 3090). In any case, an individual seeking a subpoena must show that the documents are relevant and admissible and request them with sufficient specificity to meet the requirements of Rule 17(c). *Nixon,* 418 U.S. at 700, 94 S.Ct. 3090.

With respect to the Government's two legal challenges to the Zgoznik subpoenas, the Government cites no authority for its argument that a party must first procure an order of this court before issuing a subpoena under Rule 17. The requirements of *Nixon* must be followed for such a subpoena to be valid, but hearing the parties on a motion to quash provides such an opportunity. With respect to the other challenge, the Government rightly points out Sixth Circuit authority indicating that Rule 17 subpoenas directing appearance or production other than at trial are improper. *United States v. Keen,* 509 F.2d 1273, 1274–75 (6th Cir.1975). In this respect, it appears that the subpoena might be technically deficient—the Government points out in its motion that, if the

court did issue an order permitting a subpoena, the subpoena would direct production at court, and then the parties could agree to produce elsewhere—though that technical deficiency does not appear to be reason enough to quash the subpoena. Modification of it under Rule 17(c)(2) to direct production at court, unless the parties consent to production elsewhere, is a more sensible solution.

▮ On the question of the Government's standing to quash the subpoenas issued by Zgoznik, it seems clear that the Government can challenge the subpoena issued by Zgoznik regarding Bishop Pilla's records (analogous to documents sought in ¶ 17 of the Smith subpoena),[3] as the bishop has been designated as a trial witness. *United ed States v. Nachamie*, 91 F.Supp.2d 552, 560 (S.D.N.Y.2000). However, the Government appears to lack standing with respect to the other two subpoenas, unless those other individuals are also trial witnesses. With respect to the subpoena of the Merrill Lynch records (the documents sought in ¶ 9 of the Smith subpoena), the Diocese has standing because it is a Diocese account. However, a subpoena of the records of Resultant Corporation (at Huntington Bank) cannot be challenged by either the Diocese or the Government, because those records are not Diocese records, and they apparently are not property of a Government witness. *Id.* at 558 (citation omitted).

## B. The Documents Sought by the Smith Motion and the Zgoznik Subpoenas

### 1. *Smith's Motion to Compel*

▮ Smith's motion to compel seeks materials from the Diocese to establish that he did not engage in mail fraud or money laundering in the Kickback Scheme. Smith claims that the approximately $784,000 he received from the Zgoznik Entities was authorized and approved by Father Wright, Smith's predecessor as F & L Secretary. Smith argues that if this is the case, he would not be guilty of mail fraud, or money laundering based on that mail fraud. In support of this line of argument, Smith points to the acts alleged in the Fidelity

Account scheme—namely that Father Wright specifically authorized the payment of $185,000 as compensation to Smith to prevent him from leaving the Diocese for the private sector, and claims that the additional $85,000 referenced in the Fidelity Account scheme was also approved by Father Wright. Smith then claims that Father Wright directed further additional compensation be paid to Smith through the Zgoznik Entities, in the manner described in the Kickback Scheme.

Father Wright admits authorizing the $270,000 in additional compensation paid to Smith through the Fidelity Account, but denies authorizing the $784,000 paid through the Zgoznik Entities. Smith appears to want to argue to the jury the idea that *if* Father Wright authorized the slightly-under-the-table compensation of Smith using the Fidelity Account, he *could* have authorized the under-the-table compensation of Smith through the Zgoznik Entities, creating reasonable doubt on Smith's specific intent. Father Wright has claimed, with respect to the $784,000, that he was duped in some fashion. Smith seeks evidence to counter that assertion, and to show both that Father Wright authorized the extra compensation through the Zgoznik Entities and that Smith reasonably believed Father Wright had the power to do so. Smith claims that Father Wright is a sophisticated attorney who used the Zgoznik Entities to compensate other Diocese employees in ways very similar to the way Smith was compensated in the Kickback Scheme. In short, Smith alleges that because it was a common practice under Father Wright to arrange for compensation by payment through intermediaries and/or failing to report payments as compensation, Smith reasonably believed the payments he caused— the $784,000 in the Kickback Scheme—were similarly authorized. Smith also disputes the indictment's claims that he caused the Diocese to hire the Zgoznik Entities.

▮ Smith also requests documents concerning compensation paid to him in the CCA scheme, which he claims was authorized by Father Wright (as Wright was also CEO of the CCA). However, it is unclear how strategic planning documents and travel rec-

---

**3.** References in bold are to paragraphs in        Smith's draft subpoena.

ords for Smith are exculpatory with respect to the charges arising out of the CCA scheme, or tend to establish the pattern of conduct Smith contends is exculpatory with respect to the Kickback Scheme. Smith also seeks documents relating to the employment of the insurance firm in the Insurance scheme, claiming that the Diocese chose to employ the firm, and such relationship was independent of and predated Smith's relationship with the firm. As with the strategic planning documents and travel records, it is unclear how the documents Smith requests are exculpatory with respect to the charges arising out of the Insurance scheme, or tend to establish the pattern of conduct Smith contends is exculpatory with respect to the Kickback Scheme. The court therefore denies Smith's motion to compel with respect to the documents sought in ¶¶ 14b., 14c., & 15 of the draft subpoena.

██ With respect to the tax charges, Smith claims that the Diocese has a habit of failing to report payments as income to the IRS, or to the individuals to whom those payments are made. It is not entirely clear how this provides a defense to Smith on the tax charges, because even if the Diocese did not report it as income, Smith knew or should have known he was receiving the payments, and that it was income under federal income tax law. That other individuals (up to and including the Bishop) committed tax evasion does not relieve Smith of liability for his tax evasion. Smith claims that the Bishop's alleged tax evasion may be used to attack his credibility, but using those documents for such a purpose is different than seeking the Bishop's records for exculpatory reasons. However, given the Bishop's anticipated testimony regarding the Diocese's financial practices, his records could be used for exculpatory reasons as described above to counter any assertions of fraudulent or unlawful intent and uncommon practice on Smith or Zgoznik's part.

Smith also requests the internal investigation performed by the Diocese that led to the indictment, claiming that the investigation was selective. Smith desires the original witness statements obtained by the Diocese, which led to the claim made by the Diocese to its insurance company.

In its response to Smith's motion to compel, the Government claims that it does not possess any of what Smith requests, and that it has already turned over what it does have to Smith. The Government does, however, oppose the motion to compel in part, arguing that some of the documents requested are not relevant, not admissible, or are purely for impeachment purposes and are thus not subject to pre-trial discovery by subpoena under Federal Rule of Criminal Procedure 17(c). In short, the Government says that seeking these documents is no more than an attempt by Smith to muddy the water with potentially questionable practices that are irrelevant to this case, in an attempt to smear the Diocese without actually addressing Smith's conduct. The Government claims that the use of the Zgoznik Entities to pay Smith, in the Kickback Scheme, is different from the use of "off-book" accounts because the Zgoznik Entities are not accounts opened or controlled by the Diocese or any of its affiliated organizations. Moreover, the Government claims that the specific allegations against Father Wright and Bishop Pilla are made merely to attack their credibility, not to establish innocence on Smith's part. The court disagrees, and finds that under the defense theory advanced by Smith, the documents sought are all sufficiently relevant and potentially exculpatory, warranting their production, save for the documents sought in ¶¶ 14b., 14c., & 15 of the draft subpoena.

██ The Diocese objects to nearly all of Smith's requests, claiming that those requests are nothing more than a "fishing expedition" and seek irrelevant documents. In its brief [Docket No. 54], the Diocese offers specific factual responses, attempting to distinguish the requested documents in ¶¶ 1–12, 14–18, 20–21 from the Kickback Scheme and claiming that the information sought in those requests is irrelevant and inadmissible and therefore not subject to subpoena. With respect to ¶ 13, the Diocese claims that all documents in the possession of the Center for Pastoral Leadership relating to the Zgoznik Entities have been produced. Finally, the Diocese asserts attorney-client privilege and the work product doctrine in refusing to produce the materials requested in ¶ 19.

To assert the "work product privilege", a party must "establish[ ] that the documents he or she seeks to protect were prepared 'in anticipation of litigation.'" *United States v. Roxworthy*, 457 F.3d 590, 593 (6th Cir.2006) (citation omitted). "[I]n anticipation of litigation" has been defined by the Sixth Circuit as "'prepared or obtained *because of* the prospect of litigation.'" *Id.* (citation omitted) (emphasis in original). That belief has two parts—a party must subjectively believe litigation is a possibility, and that subjective belief must be objectively reasonable. *Id.* at 594 (citation omitted).

To assert attorney-client privilege, the Sixth Circuit has stated that:

(1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived.

*United States v. Goldfarb*, 328 F.2d 280, 281 (6th Cir.1964) (citation omitted). However, production of privileged documents to another party waives both the attorney-client privilege and the work product privilege with respect to another party seeking the same materials. *In re Columbia/HCA Healthcare Corp. Billing Practices Litig.*, 293 F.3d 289, 304, 306–07 (6th Cir.2002).

The Diocese produced the claim to the insurance company to the defendants and the Government. Smith asserts that the materials the Diocese has already produced were privileged and that as such, the production operates as a waiver to the other privileged materials. The court agrees, as it appears that the insurance claim materials initially produced to the Government and the defendants otherwise would have been privileged. Therefore, the privilege to the materials sought by Smith in ¶ 19 has been waived, and the documents must be produced.

### 2. *Motions to Quash Subpoenas Issued by Zgoznik*

Counsel for Zgoznik issued three subpoenas requesting many of the same records sought by Smith's motion to compel, and both the Government and the Diocese have moved to quash—specifically, the records sought in ¶¶ 9, 17 of the draft subpoena. As discussed above, the legal challenges to the subpoenas advanced by the Government and the Diocese—that the subpoena must be quashed because (a) Zgoznik did not secure an order of this court first and (b) the subpoena directs production to the offices of Zgoznik's counsel, as opposed to at court, as Federal Rule of Criminal Procedure 17 requires—are either without merit or warrant only modification of the subpoena instead of quashing it. The Diocese also argues that the documents sought do not meet the relevancy, admissibility and specificity requirements under the law. However, as discussed above, the court finds that the documents sought are sufficiently relevant and admissible and have been sought with sufficient specificity to warrant their production.

### III.

For the foregoing reasons, the court grants Smith's motion to compel [Docket No. 37] in part and denies it in part and denies the Government and the Diocese's respective motions to compel [Docket Nos. 43, 49]. The court orders that the documents sought in the draft subpoena [Docket No. 50] are to be produced, except for those sought in ¶¶ 14b., 14c., & 15. Additionally, the documents sought by the subpoenas issued by Zgoznik are to be produced, and all production is to take place at court, or at an alternate location agreed upon by all parties. The documents produced are to be kept strictly confidential, and are to be disclosed or released only to the Government, the defendants, and their counsel. Following review of the documents, the parties may file motions in limine to exclude particular documents or subject matter. The court is to be provided a copy of all documents produced in response to the Smith and Zgoznik subpoenas. Production shall take place as soon as practicable upon issuance of this order.

Finally, the court modifies the deadlines in its May 30, 2007 order [Docket No. 64]. The parties' proposed questions are to be submitted by June 21, 2007. The court shall provide to the parties a draft of the questionnaire by June 25, 2007. Written objections

**614**

to the court's proposed questionnaire may be made, but must be filed by June 29, 2007. If necessary, the court shall schedule a hearing on the parties' objections prior to August 1, 2007. Potential jurors will be brought in on August 1, 2007, to answer the written questionnaire, and the court shall schedule a conference to review the potential jurors' responses and select potential jurors to appear on August 15, 2007 for voir dire and empaneling.

IT IS SO ORDERED.