*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 13a0324p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,

        *Plaintiff-Appellee,*

    v.

GABRIEL LLANEZ-GARCIA,

        *Defendant,*

DEBRA KANEVSKY MIGDAL,

      *Interested Party-Appellant.*

No. 12-3585

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 1:11-cr-00177-1—John R. Adams, District Judge.

Argued: June 19, 2013

Decided and Filed: November 5, 2013

Before: GIBBONS and STRANCH, Circuit Judges; HOOD, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Gregory L. Poe, POE & BURTON PLLC, Washington, D.C., for Appellant. Demetra Lambros, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Gregory L. Poe, POE & BURTON PLLC, Washington, D.C., for Appellant. Demetra Lambros, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. Candace C. Crouse, STRAUSS TROY LPA, Cincinnati, Ohio, Pierre H. Bergeron, Lauren S. Kulley, SQUIRE SANDERS LLP, Cincinnati, Ohio, Kevin M. Schad, FEDERAL PUBLIC DEFENDER'S OFFICE, Cincinnati, Ohio, for Amici Curiae.

---

[*]The Honorable Denise Page Hood, United States District Judge for the Eastern District of Michigan, sitting by designation.

---

**OPINION**

---

JANE B. STRANCH, Circuit Judge.   An attorney's reputation is her most valuable possession.  It forms the basis for her peers' view of her and plays an important role—often a determinative one—in how she advances in her career.  This case began with a government attorney's unauthorized filing of a motion for sanctions against Debra K. Migdal, an attorney who has served as an Assistant Federal Public Defender for nearly 25 years.  It quickly took on a life of its own, resulting in two district-court orders strongly, publicly, and, we conclude, erroneously reprimanding Migdal.  Because the record does not support any basis for these orders, we **VACATE** the sections of the first order pertaining to sanctions, **REVERSE** the second order in its entirety, and **DISMISS** the sanctions proceeding against Migdal.

**I.  BACKGROUND**

**A.  Events leading to issuance of the subpoenas**

The sanctions proceeding against attorney Migdal at issue in this appeal arises out of Gabriel Llanez-Garcia's prosecution for alien smuggling.  *See* 8 U.S.C. § 1324. Llanez-Garcia was in a vehicle with three other men on April 6, 2011, when an Ohio State Highway Patrol (OSHP) officer pulled the vehicle over.  Unable to communicate with the vehicle's Spanish-speaking occupants, the OSHP officer called the United States Border Patrol to the scene.  After the Border Patrol officers determined the four men were Mexican citizens in the United States illegally, they were arrested.  A dash-cam videotape mounted on the OSHP patrol car recorded the encounter.

Days after his arrest, Migdal was appointed to represent Llanez-Garcia and the case was assigned to Judge John R. Adams.  The preliminary hearing was held on April 15.  Planning to challenge the legality of the stop, Migdal requested the Border Patrol report of the investigation and the names of the vehicle's three other occupants.  The government agreed to supply the report.  Migdal also asked the Border Patrol agent for

the occupants' locations and whether they had been deported or voluntarily returned to Mexico. He told Migdal that he did not know. Later that day, Migdal sent a letter via fax and mail to Gregory Sasse, the Assistant United States Attorney assigned to the case, objecting to the release or deportation of the three men. As it was a Friday, Migdal asked Sasse if they could discuss the issue on Tuesday, April 19.

Unbeknownst to Migdal, two of the men had already been deported to Mexico on April 12 on a flight that ferries undocumented immigrants from Cleveland to Mexico every Tuesday. On Tuesday, April 19, the driver of the car—the third and final witness—was put on the weekly flight and deported as well. Sasse later denied receiving Migdal's letter and implied to the court that Migdal may not have sent it in the first place.

Migdal made a general discovery request to the government on April 27 pursuant to Federal Rule of Criminal Procedure 16. Among other things, Rule 16 enables a defendant to obtain "books, papers, documents, data, photographs, [or] tangible objects" in "the government's possession, custody, or control," as long as the items are either material to preparing the defense or will be used in the government's case-in-chief at trial. Migdal asked for such items falling under this rubric. She also asked the government to preserve all rough notes and evidence in the case, including dispatch tapes, and to ensure that "all discovery is turned over."

Sasse emailed Migdal documents in response to her request two days later. The information he sent included a Border Patrol report, Llanez-Garcia's Record of Deportable/Inadmissible Alien from the Department of Homeland Security (Form I-213), the criminal complaint issued against him, the Border Patrol agent's affidavit, and Llanez-Garcia's statement (Form I-215B).

On May 17, Migdal emailed Sasse to object to apparent redactions of certain names in the discovery materials and asked him to provide unredacted versions of the documents. Sasse refused, citing a policy of protecting the identities of witnesses. Though neither attorney knew it at the time, Sasse and Migdal's apparent disagreement was unfounded: The names Sasse believed were redacted were already disclosed in the

government's response, and the redactions to which Migdal objected pertained only to the witnesses' foreign addresses, for which Migdal had no need. Terse emails fired back and forth for two days. The volley ended when Migdal threatened to file a motion to compel the government to produce the documents to which she believed she was entitled.

Migdal, however, did not file a motion to compel at that time. Instead, on May 26, 2011, she issued two subpoenas pursuant to Federal Rule of Criminal Procedure 17(c) to the custodians of records at the OSHP and the Border Patrol. A Rule 17(c) subpoena commands a person to appear to testify or to "produce any books, papers, documents, data, or other objects" without testifying. Fed. R. Crim. P. 17(c)(1). The rule says that a court "may direct" production of designated items "in court before trial or before they are to be offered in evidence," and "may permit the parties and their attorneys to inspect all or part of them." *Id.* Filling in AO Form 89—the generic Rule 17(c) subpoena form provided by the Administrative Office to the United States Courts and available on the Northern District of Ohio's website—Migdal sought "audio/visual recordings and/or other documentation relating to the vehicle stop and subsequent encounter," including "dispatch tapes, radio communications, unit to unit communications and dash cam recordings." Migdal later explained that she needed materials related to the traffic stop underlying Llanez-Garcia's arrest to support a motion to suppress, which she ultimately filed on June 1.

Only one Rule 17(c) subpoena form exists. The stock language on it "command[s]" the recipient "to appear in the United States district court at the time, date, and place shown below to testify in this criminal matter." In the "place of appearance" box, Migdal wrote in Judge Adams's courtroom and fixed the date and time for June 3 at 9:00 a.m. Migdal also provided contact information for an investigator and an attorney the recipients could call to arrange delivery of the subpoenaed materials instead of appearing in person.

The problem—and the central reason this sanctions proceeding materialized—was that no hearing was scheduled for June 3. Instead, the only two dates

on the court's calendar were June 9, the date set for a pretrial hearing, and June 20, the date on which trial was to begin. According to Migdal, she placed an early return date on the subpoenas because she anticipated the June 9 pretrial hearing would be converted into an evidentiary hearing on her suppression motion and she needed time to review the subpoenaed materials prior to that date. She stated in an affidavit that her purpose was to not "disrupt the Court's schedule" or "have to move for a continuance of the evidentiary hearing and/or trial." Migdal insisted that she did not "act with any improper motive," nor have "any intent to misuse the Court's subpoena power."

Meanwhile, upon receiving the subpoena, the Border Patrol agent who arrested Llanez-Garcia contacted Sasse to see if he was required to appear with documents in Judge Adams's courtroom on June 3. Sasse advised the agent to ignore the subpoena.

On June 2, Sasse moved the court to quash the Border Patrol subpoena and to sanction Migdal. (At the time, Sasse did not know that Migdal served a separate subpoena on the OSHP.) Still unaware that the names of the individuals arrested with Llanez-Garcia had been disclosed, Sasse's motion complained that Migdal was trying to end-run the discovery process by using a subpoena to learn their identities. He further charged that Migdal violated Rule 17(c) by failing to get court authorization before issuing the subpoenas and by commanding a Border Patrol agent to appear and produce documents at a non-existent hearing. Finally, Sasse moved "for whatever sanctions the Court deems appropriate." The district court ordered on June 3 that the motion to quash would be resolved at the pretrial conference scheduled for June 9.

At that conference, Sasse provided Migdal with the Border Patrol's dash-cam videotape, photographs, and written notes related to the stop. He also learned for the first time that Migdal had separately subpoenaed the OSHP and had already received overlapping materials from the state trooper, including the OSHP's dash-cam recording, a recording of the dispatch call, and a written log. In response to the allegations in Sasse's June 2 motion, Judge Adams continued Llanez-Garcia's trial and set a separate hearing on the sanctions motion for July 14.

**B.  The September 13, 2011 order**

At the evidentiary hearing on July 14, 2011, the government set out its view that the subpoenas violated Rule 17(c) because they improperly commanded appearance at a non-scheduled hearing and lacked court approval required under Rule 17(c).  With respect to sanctions against Migdal, however, the government urged that Migdal not be sanctioned and noted that it had withdrawn its sanctions request a week earlier.  Art Hernandez, Sasse's supervisor in the United States Attorney's office, explained that Sasse failed to follow the Department of Justice's policy requiring supervisory approval of any sanctions requests.  Hernandez further explained that while the government believed that Migdal violated Rule 17(c), the government did not believe that she intended to circumvent the court's authority, "get information in a misleading type of way," or otherwise mislead the witnesses or the court.  He offered that other public defenders in Migdal's office had issued similar subpoenas in the past, which suggested that Migdal did not act in bad faith.

After hearing from the government, Judge Adams gave Migdal an opportunity to explain her thinking.  With respect to the court's role in authorizing subpoenas, Migdal emphasized that Rule 17(c)(1)'s language—stating that a court "may" direct document production—was "passive," in contrast to the express language of Rule 17(c)(3), a provision which permits a subpoena for certain information to be served "only by court order."  Migdal also drew the court's attention to conflicting authority on the question of the court's proper role, including an order from a court in the same judicial district concluding that a party does not have to procure a court order before issuing an early-return subpoena under Rule 17(c). *Compare United States v. Smith*, 245 F.R.D. 605, 610–11 (N.D. Ohio 2007) *with United States v. Beckford*, 964 F. Supp. 1010, 1020–21 (E.D. Va. 1997) (stating that Rule 17(c) contemplates court involvement in pretrial document production)).

Migdal then explained why she did not ask the government for the dash-cam videotape in the Rule 16 discovery request she propounded.  She asserted that she did not believe the videotape was technically discoverable under that rule because Rule 16

only requires the government to produce evidence it actually possesses *and* intends to introduce at trial; not knowing whether the government planned to use the videotape, Migdal went "directly to the source" for it. In her experience, she said, even the most conscientious prosecutors cannot be relied on to obtain all relevant exculpatory material.

Migdal went on to clarify that she entered a date and time on the subpoena forms for delivery of the materials to Judge Adams's courtroom that day, even though no hearing was actually scheduled, because she was "trying to work within the framework" of AO Form 89, which includes a blank space to enter a place and time for appearance. She pointed out that AO Form 89, titled "Subpoena to Testify at a Hearing or Trial in a Criminal Case," serves two functions—it is used both to procure witness testimony under Rule 17(a) *and* to produce evidentiary materials under Rule 17(c)—but does not clearly differentiate between them. Migdal observed that while no separate form is available to issue a subpoena duces tecum in criminal matters, the civil-subpoena form, AO Form 88B, clearly contemplates that a party may provide documents to the court instead of appearing.

Moreover, Migdal reported that a lawyer in her office corresponded with an attorney associated with the Administrative Office Forms Working Group, a body composed of judges and clerks of court that advises on proposed changes to court forms. The attorney confirmed that no separate subpoena form is available to use in criminal matters, but that some courts note "Documents only" on the form if a witness's attendance is not needed.

The district court issued the first of two orders now on appeal on September 13, 2011.[1] Despite the fact that the government withdrew its request for sanctions, Judge Adams announced that the court would hold another hearing to allow Migdal "the

---

[1]After the July 14 hearing, Judge Adams also issued a standing order that requires the court's authorization before a subpoena can issue for pretrial production of evidence under Rule 17(c). *See* http://www.ohnd.uscourts.gov/home/judges/judge-john-r-adams. The standing order allows a subpoena to be requested ex parte and describes the showing a defendant must make to obtain one. It also provides that the items sought must be delivered to the court at a place, date, and time indicated, unless the subpoena specifically provides for production to the issuing attorney. Needless to say, the standing order was issued after the controversy here arose, so it could not have been instructive to Migdal in this case.

opportunity to respond to the actions that the *Court* finds sanctionable." The court's order outlined the offending conduct. First, the court found that Migdal improperly issued Rule 17(c) subpoenas without first making a sufficiently specific request to the government for the information under Rule 16. Citing the court's authority under 28 U.S.C. § 1927 to sanction an attorney who "unreasonably and vexatiously" multiplies court proceedings, Judge Adams concluded that Migdal had done so in Llanez-Garcia's case.

Next, the district court determined that placing a "fabricated" date and time on the subpoenas was "a serious misrepresentation" the court would "not take lightly." Although the court recognized that AO Form 89 does not distinguish between a Rule 17(a) subpoena to testify and a Rule 17(c) subpoena for documents, Migdal's action nevertheless was an "inexcusable usurpation of the Court's power to control its own docket" that demonstrated a "flagrant disregard for the power of the subpoena."

As for Migdal's view that Rule 17(c) did not require court involvement in the issuance of a subpoena, the court rejected that, too. Textually, it reasoned, Rule 17(c) says that the court "may direct the witness to produce the designated items in court before trial or before they are to be offered in evidence." Fed. R. Crim. P. 17(c)(1). That language alone does not indicate that court approval is necessary. But, Judge Adams found, the next sentence of the rule—stating that when the requested items arrive, "the court may permit the parties and their attorneys to inspect all or part of them"—"makes it clear that to obtain these items *before* a hearing or trial . . . the Court must review and approve the request so that the *Court* may direct the items to be produced." To exercise the discretion contemplated by the rule, Judge Adams determined, the court must approve the subpoena first. He concluded that Migdal's actions "stripped" the court of that "discretionary power."

The September 13 order concluded by setting another hearing on three sanctions-related issues: 1) Migdal's use of a subpoena to secure items before seeking them in discovery; 2) her "fabrication of a date and time" for the Border Patrol agent to appear

at a court hearing; and 3) her "utter disregard for the implicit requirement" of Rule 17(c) that the court "must approve and order early production subpoenas."

Migdal withdrew from representing Llanez-Garcia the same day that the court's order issued. She cited the "chilling effect" of the court's finding that her conduct was "vexatious," which Migdal feared would undermine her ability to be an effective advocate. Llanez-Garcia pled guilty to the alien-smuggling charge soon after.

## C. The May 3, 2012 order

The second hearing was held on November 4, 2011. Now represented by counsel, Migdal moved to vacate the September 13 order and dismiss the sanctions proceeding. Substantively, she reiterated her claim of good faith and submitted the same justifications for her actions. First, Migdal stated that Rule 17(c) does not clearly require court approval for an early-return document subpoena. Second, Migdal maintained that she was trying to work within the form's confines and not disrupt the court's schedule when she placed the June 3 return date on the subpoenas. Third, she explained that subpoenaing the dash-cam videotape under Rule 17(c) before asking the prosecutor for it under Rule 16 was not improper because the videotape was not plainly in the government's possession within the meaning of the latter rule.

Migdal also presented new evidence. She filed several affidavits from lawyers in her office stating that they previously had issued similar subpoenas containing return dates and courtroom information that did not correspond to scheduled hearing times. She also submitted an informal survey her office conducted of other Federal Public Defender offices across the country showing varying practices in different judicial districts with respect to Rule 17(c) subpoenas. Migdal explicitly apologized to the court, saying that she had "always attempted to [respect] and in no way attempted to undermine [its] authority." At bottom, Migdal argued, her lack of bad faith or improper motive made sanctions inappropriate.

The government agreed, as it had done before, and explained that Migdal's "state of mind" did not suggest that she believed that "she was misinterpreting the rule" or that she "intend[ed] to usurp the Court's power."

The district court was not appeased. On May 3, 2012, the court issued a second order finding Migdal's conduct sanctionable. After rejecting Migdal's claim that she did not act in bad faith because other lawyers in her office engaged in similar conduct, the court noted: "The mere fact that multiple individuals may be engaging in conduct that abuses the Court's subpoena power and fraudulently misrepresents the Court's schedule cannot serve as a *defense* to sanctions. If anything, it only demonstrates a stronger need for sanctions in order to deter such alleged widespread misconduct."

The court then set forth two lines that Migdal had crossed. First, it held that Rules 16 and 17 require a defendant to request documents and objects from the government under Rule 16 before subpoenaing the same items from third parties under Rule 17. Migdal violated this "straightforward rule," the court opined, "routinely" and "without justification," resulting in "a usurpation of the Court's subpoena power" by "deliberately failing to follow the proscribed [sic] discovery process, [Migdal's] actions cannot be described as anything less than intentional acts performed in bad faith." Migdal's conduct, it concluded, "warrants sanctions under both the Court's inherent authority and under § 1927."

The second basis for the sanctions order was the court's conclusion that Migdal violated her ethical duty of candor to the court and third parties when she issued subpoenas falsely representing that a court hearing had been scheduled. While the court recognized that a defense attorney must zealously advocate for a client, that does not mean that an attorney can "ignore the rules of criminal procedure[,] . . . make misrepresentations or play fast and loose with the Court's schedule." Issuing subpoenas with information Migdal knew to be false "far exceeded" those bounds. The court sanctioned Migdal so as "to discourage any future conduct" she might seek to justify under the guise of zealous representation. Branding a blemish on Migdal's reputation, the court ordered "a PUBLIC REPRIMAND of Attorney Migdal."

**D.     The present appeal**

Migdal timely appealed from the September 13 order but this court dismissed the appeal without prejudice because the first order, standing alone, was not a final ruling. Migdal's appeal of the second order followed on May 16, 2012.  Although it was not denominated as a formal reprimand, the September 13 order outlines "actions that the *Court* finds sanctionable," which include misusing the subpoena process, "unreasonably and vexatiously" multiplying the proceedings, and engaging in "inexcusable" conduct that demonstrates a "flagrant disregard for the power of the subpoena."  Given that, the first order is functionally a public reprimand—and thus a reviewable sanctions order—even if the district court did not call it that.  *See In re Wingerter*, 594 F.3d 931, 938 (6th Cir. 2010) (a court order that highlights a litigant's alleged violation of a bankruptcy rule and criticizes its business practices is a sanction even if the court "fail[s] to expressly use the word 'reprimand,'" and a contrary conclusion is "a distinction without a difference"); *see also Adams v. Ford Motor Co.*, 653 F.3d 299, 304–06 (3d Cir. 2011) (an order unaccompanied by a formal reprimand constitutes an appealable sanction where the order "directly undermines [counsel's] professional reputation and standing in the community").  As a result, both orders are properly before us for review.

## II.  ANALYSIS

The district court's September 13, 2011 and May 3, 2012 orders found Migdal's conduct sanctionable under both the court's inherent authority and 28 U.S.C. § 1927. The fundamental question in this appeal is whether either basis empowered the district court to sanction Migdal.

**A.  28 U.S.C. § 1927**

We start with the first basis and ask whether § 1927 authorizes a district court to issue a public reprimand.  Although we review the award of sanctions for abuse of discretion, *see Shepherd v. Wellman*, 313 F.3d 963, 969 (6th Cir. 2002), the construction of § 1927 is a question of law that we review de novo.  *See Koon v. United* States, 518 U.S. 81, 100 (1996) ("A district court by definition abuses its discretion when it

makes an error of law."); *Cooter & Gell v. Hartman Corp.*, 494 U.S. 384, 405 (1990) ("A district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence."). Migdal and the government agree that § 1927 does not authorize a district court to issue a reprimand. So do we. Section 1927 provides that a district court may "assess excess *costs, expenses, and attorney fees* directly against an attorney 'who so multiplies the proceedings in any case unreasonably and vexatiously.'" *Waeschle v. Dragovic*, 687 F.3d 292, 296 (6th Cir. 2012) (quoting 28 U.S.C. § 1927) (emphasis added). The statute requires the attorney to "satisfy personally the excess costs" attributable to her noisome litigation tactics. 28 U.S.C. § 1927.

On its face, § 1927 does not permit the court to publicly reprimand an attorney or, for that matter, to impose any other non-monetary sanctions. *See Roadway Express, Inc. v. Piper*, 447 U.S. 752, 757 (1980) (noting that § 1927 only "involves taxing costs against counsel"). The district court misapplied the law when it ignored the clear language of the statute and issued a non-monetary sanction under § 1927. Because a district court abuses its discretion when it misconstrues the law, *United States v. Haygood*, 549 F.3d 1049, 1052 (6th Cir. 2008), the district court clearly did so here when it erroneously relied on § 1927 as authority to reprimand Migdal.

**B. Inherent authority**

We next consider the district court's decision to impose sanctions under its inherent authority, which we also review for an abuse of discretion, *United States v. Aleo*, 681 F.3d 290, 305 (6th Cir. 2012), reviewing underlying questions of law de novo. *See Cooter & Gell*, 494 U.S. at 405; Harry T. Edwards & Linda A. Elliott, Federal Standards of Review 68 (2007). The Sixth Circuit has not squarely addressed whether a district court has the power to impose sanctions on counsel in a criminal case without initiating criminal-contempt proceedings under Federal Rule of Criminal Procedure 42 and the criminal-contempt statute, 18 U.S.C. § 401. This court recently questioned "whether the inherent authority to sanction even exists in a criminal case" because Rule 42, "covering criminal contempt, is the sole mechanism for punishing bad-faith conduct

in criminal cases." *Aleo*, 681 F.3d at 305 n.13; *see also id.* at 306–12 (Sutton, J., concurring) (writing separately to "express skepticism about a lower federal court's power *ever* to use inherent authority . . . to punish a defense attorney in a criminal case for filing a frivolous motion"); *but see In re Smothers*, 322 F.3d 438, 442 (6th Cir. 2003) (vacating criminal-contempt order and noting that a court confronted with actions that may not fall within its contempt power has "inherent power to maintain respect and decorum [that] grants [the] court[] the flexibility to equitably tailor punishments that appropriately fit the conduct"). Just as in *Aleo*, however, we do not need to reach this issue because Migdal's conduct does not merit sanctions under either the court's contempt power or its inherent authority. *See* 681 F.3d at 305 n.13.

"The inherent powers of federal courts are those which 'are necessary to the exercise of all others.'" *Roadway Express*, 447 U.S. at 764 (quoting *United States v. Hudson*, 11 U.S. (7 Cranch) 32, 34 (1812)). "Because inherent powers are shielded from direct democratic controls, they must be exercised with restraint and discretion." *Id.* "A court may exercise its inherent power to sanction when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons, or when the conduct was tantamount to bad faith." *Aleo*, 681 F.3d at 305 (internal quotation marks omitted).

Bad-faith conduct requires the district court to find "(1) that the claims advanced were meritless, (2) that counsel knew or should have known this, and (3) that the motive for filing suit was for an improper purpose such as harassment." *Id.* (internal quotation marks omitted). A reviewing court "may uphold an order of sanctions even without an 'express finding of willfulness, bad faith or recklessness,' but only if the record sets forth evidence that the party acted in bad faith." *Id.* (quoting *Metz v. Unizan Bank*, 655 F.3d 485, 490 (6th Cir. 2011)). But we "must find *something more* than that a party knowingly pursued a meritless claim or action at any stage of the proceedings." *Id.* (internal quotation marks omitted). Bearing this standard in mind, we consider the three grounds on which the district court sanctioned Migdal.

### 1. The government-as-gatekeeper theory

The first ground was for failing to request from the government under Rule 16 the items Migdal sought in the Rule 17(c) subpoenas. The district court concluded that the "straightforward" interplay between the two rules permits a criminal defendant to seek to obtain items from a third party via a Rule 17(c) subpoena only after requesting—and not getting—the necessary items from the government via Rule 16 discovery. We review the district court's construction of these rules de novo. *United States v. Burke*, 345 F.3d 416, 421 (6th Cir. 2003).

Rule 16 is the primary means of discovery in criminal cases. It "delineates the categories of information to which defendants are entitled in pretrial discovery in criminal cases, with some additional material being discoverable in accordance with statutory pronouncements and the due process clause of the Constitution." *United States v. Ramos*, 27 F.3d 65, 68 (3rd Cir. 1994) (noting, for example, that the government is obligated under the Jencks Act to turn over "any statement" made by a witness that relates to her testimony, and required to produce all "exculpatory" evidence under *Brady v. Maryland*, 373 U.S. 83 (1963)). Upon request, Rule 16 requires the government to "permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items." Fed. R. Crim. P. 16(a)(1)(E). But this obligation does not arise unless "the item is within the government's possession, custody, or control *and*: (i) the item is material to preparing the defense; (ii) the government intends to use the item in its case-in-chief at trial; or (iii) the item was obtained from or belongs to the defendant." *Id* (emphasis added).

Rule 17(c), by contrast, implements a criminal defendant's constitutional right "to have compulsory process for obtaining witnesses in his favor" by providing a means to subpoena witnesses and documents for a trial or a hearing. U.S. Const. amend VI; *see also* 2 Charles Alan Wright et al., Federal Practice and Procedure § 272 (4th ed.) ("Rule 17 is not limited to subpoenas for the trial" and a subpoena may be issued for a preliminary examination, a grand jury investigation, a deposition, a determination of a

factual issue raised by a pre-trial motion, or a post-trial motion).  Rule 17(c)'s "chief innovation" is to "expedite the trial by providing a time and place before trial for the inspection of the subpoenaed materials." *Bowman Dairy Co. v. United States*, 341 U.S. 214, 220 (1951).  Under it, a criminal defendant "may order the witness to produce any books, papers, documents, data, or other objects the subpoena designates."  Fed. R. Crim. P. 17(c)(1).  In its discretion, "[t]he court may direct the witness to produce the designated items in court before trial or before they are to be offered in evidence."  *Id*. And when the subpoenaed items arrive, "the court may permit the parties and their attorneys to inspect all or part of them."  *Id*.  To protect a party on the receiving end of the subpoena, Rule 17(c) enables the court to "quash or modify the subpoena if compliance would be unreasonable or oppressive."  *Id*. 17(c)(2).

While Rule 16 only imposes an obligation on the government to turn over documents and objects, Rule 17(c) sweeps more broadly by allowing a defendant to request them from the government *or* third parties.  *Bowman Dairy*, 341 U.S. at 219 (observing that there is "[n]o good reason" why documents not subject to Rule 16 "may not be reached by subpoena under Rule 17(c) as long as they are evidentiary").  The Supreme Court has cautioned, however, that Rule 17(c) is not meant to provide an additional way to secure pretrial discovery.  *Id*. ("It was not intended by Rule 16 to give a limited right of discovery, and then by Rule 17 to give a right of discovery in the broadest terms.").  To contain the danger that criminal defendants might misuse Rule 17(c) to expand the scope of discovery, the Court in *United States v. Nixon* held that a defendant could subpoena materials using a Rule 17(c) subpoena only if four conditions are met.  418 U.S. 683, 699 (1974).  First, the items must be evidentiary and relevant. *Id*.  Second, the items may not be otherwise procurable through due diligence prior to trial.  *Id*.  Third, the requesting party must be unable to properly prepare for trial without such pre-trial production and inspection.  *Id*.  And, finally, the application must be made in good faith and not amount to a "fishing expedition."  *Id*.

Returning to the district court's interpretation of the interplay between Rules 16(a)(1)(E) and 17(c), its view is wrong for at least two reasons.  First, the text of neither

rule requires a defendant to first come to the government for discovery under Rule 16 before seeking a subpoena for evidence under Rule 17.  As the government's brief aptly puts it, "there is no exhaustion requirement in Rule 17(c)."  Beyond the absence of textual support, the practical effects on the government's discovery obligations—to say nothing of the possibility of undesirable gamesmanship—make the district court's position even more doubtful.  Because the government does not possess or control all of the materials potentially relevant to a defendant's case, and is not obligated to acquire materials possessed or controlled by others, the criminal-procedure rules do not make the government the gatekeeper to evidence it may not have.  Moreover, to the extent the government-as-gatekeeper theory allows the government to obstruct a criminal defendant's access to materials needed for his defense by strategically opting not to obtain them itself, this erroneous legal view risks frustrating the defendant's guarantee of compulsory process under the Sixth Amendment.  In sum, because the district court's view that a defendant must first ask the government for discovery under Rule 16 before subpoenaing evidence under Rule 17 finds no support in the text or the purpose of either rule, its reasoning was in error.

Migdal alternatively argues that she should not have been sanctioned for failing to observe the district court's misguided government-as-gatekeeper rule because she had a good-faith belief that the evidence she subpoenaed from the Border Patrol and the OSHP was not discoverable under Rule 16.  Migdal's contention is that she did not engage in discovery by subpoenaing Rule 16-covered materials, but instead sought only Rule 17(c)-covered evidentiary materials from two agencies that she understood to be third parties in this particular context.

Our analytical goal is not to determine whether Migdal was right or wrong on the merits.  Instead, it is to assess whether her explanations for her conduct support the district court's conclusion that she deliberately failed to follow the prescribed discovery process. Concluding that Migdal engaged in bad-faith conduct—which is a prerequisite for an inherent-authority sanction—requires finding that the claims she advanced were meritless, that she knew or should have known it, and that she had an improper motive

for doing so.  *See Aleo*, 681 F.3d at 305; *see also First Bank of Marietta v. Hartford Underwriters Ins. Co.*, 307 F.3d 501, 520–21 n.16 (6th Cir. 2002) ("Bad faith presents an issue of intent that is a factual issue.").

Migdal makes two claims to show that she did not act in bad faith.  The first is that she issued the Rule 17(c) subpoenas based on her understanding that the government's obligation to produce materials under Rule 16 is limited by its intention to use them at trial in its case-in-chief.  As she explained to the district court, "items requested in discovery . . . are . . . Rule 16 items which the government intends to introduce at trial . . . versus items of evidentiary use" that come under Rule 17.  Migdal reiterates her argument here, pointing for support to the distinction the Supreme Court has drawn between "evidentiary" materials and "discovery" materials.  In *Bowman Dairy*, she says, the Court explained that Rule 17(c) subpoenas to the government for evidentiary materials properly embrace "any document or other materials, admissible as evidence, obtained by the Government by solicitation or voluntarily from third persons" that "are not put in evidence by the Government." 341 U.S. at 219, 221.  Such materials ultimately do not have to "be used in evidence"; it is enough that the request for them represents "a good-faith effort . . . to obtain evidence."  *Id*. at 219–20.  By contrast, Migdal continues, the Court has said that Rule 16 discovery materials encompass "documents and other materials otherwise beyond the reach of the defendant which . . . might be numerous and difficult to identify."  *Id*. at 219.  So while Rule 17(c) forbids a "fishing expedition to see what may turn up," *id*. at 221, Migdal concludes, it allows a good-faith effort to secure targeted materials to be used at a hearing or trial.

Though Migdal again makes a carefully reasoned argument, our concern is not whether the distinction she draws between Rule 16 discovery materials and Rule 17 evidentiary materials is right or wrong; we ask, instead, whether the record indicates bad-faith conduct to support the district court's determination.  In that regard, the record here is barren.  Migdal's plausible understanding of the law—whether or not it is the best reading—supports her good-faith belief that the pursuit of targeted information intended for use in an anticipated pretrial hearing was not a prohibited "fishing expedition."

Further still, Migdal made a Rule 16 request to the government on April 27, 2011, for "all" discoverable information, including documents and tangible objects pursuant to Rule 16(a)(1)(E), and asked for "notice" of the evidence the government intended to use at trial. When the response she received on April 29 did not include a tape of the dispatch call, the dash-cam recording, and the logs—all of which Migdal ultimately sought via the Rule 17(c) subpoenas nearly a month later—she may have reasonably believed that the government's failure to produce them meant they did not fall under Rule 16.

The second claim Migdal makes in support of the conclusion that the Rule 17 subpoenas did not attempt to improperly discover Rule 16 materials is that ambiguity exists as to whether either the Border Patrol, an independent federal agency, or the OSHP, an agency of a state sovereign, is the "government" for Rule 16 purposes. (The district court did not distinguish between the subpoenas to the two agencies even though Migdal argued they should be analyzed separately.)

With an assist from amicus curiae National Association of Criminal Defense Lawyers (NACDL), Migdal maintains that because the term "government" in the Rule 16 context should be read to include federal agencies participating in the investigation of the defendant, the prosecution's failure to hand over information in the hands of those agencies in response to a Rule 16 discovery request entitles the defendant to treat them as third parties. Although the Border Patrol *could* fall under the rubric of the "government" for purposes of Rule 16 discovery in some circumstances, the prosecution's failure to provide information Migdal believed to be in the Border Patrol's hands in response to her Rule 16 request supports her conclusion that the agency was a third party. As for the OSHP, NACDL maintains that as an agent of a state sovereign, that agency is not the "government" for Rule 16 purposes, meaning that Migdal's subpoena to it as a third party was proper.

Again, the point of exploring Migdal's understanding of what the rules allowed her to do is not to determine whether her interpretation was right or wrong, but to decide whether she issued two Rule 17(c) subpoenas in bad faith. The clear markings of legal

uncertainty in this area—apparent as much in Migdal's colorable reading of the rules as in the district court's erroneous interpretation of them—make the answer simple enough: Migdal did not act in bad faith. The district court abused its discretion in finding otherwise.

### 2. The "fabricated" hearing

The district court also sanctioned Migdal for failing to observe the duty of candor to the court and third parties by issuing a subpoena commanding production at a court hearing that had been neither scheduled nor requested. Migdal acknowledged that the subpoenas were defective in that regard, apologized to the district court, and restated her respect for the court's authority several times. Unmoved, the district court sanctioned her nonetheless. On appeal, Migdal and the government both urge this court to reverse the district court's decision on this basis because the record does not support a finding that Migdal acted in bad faith. We agree.

Three key facts developed in the record support Migdal's argument that she did not know, nor should she have known, that placing a date and time on subpoenas that preceded an actual hearing date was improper. *See Aleo*, 681 F.3d at 305. The first is the failure of the subpoena form, AO Form 89, to clearly differentiate a subpoena for a witness's attendance and a request for documents. Unlike AO Form 88B, which is designed for document subpoenas in civil actions, no separate form exists for document subpoenas in a criminal case. Migdal learned after the fact that some courts write "Documents only" on AO Form 89 to denote the type of subpoena request, but explained her belief that altering the form by crossing out the time and place of an appearance would violate Rule 17(a). *See* Fed. R. Crim. P. 17(a) (a subpoena "must state the court's name and the title of the proceeding, . . . and command the witness to attend and testify at the time and place the subpoena specifies."). Despite the form's lack of clarity, Migdal emphasizes that she transparently asked for the documents to be produced to the courtroom, which is obviously not a place one specifies for the purpose of hiding something from a judge.

The second fact Migdal marshals to show that she did not in bad faith place a false date and time on the subpoenas is the identical practice of other Federal Public Defenders.  The record before the district court included affidavits from six lawyers in Migdal's office who attested to entering dates on document subpoenas that did not correspond to scheduled hearing dates.  Migdal also submitted an informal survey of Federal Public Defenders in other judicial districts, which revealed that district courts in nine of the fifteen districts that responded to the survey did not require inclusion of a scheduled hearing or trial date.

The third fact to which Migdal points to support her good-faith argument is an order written by another judge in the Northern District of Ohio finding that an early-return subpoena with a date that does not correspond to a scheduled hearing is enforceable.  In *Smith*, a defense lawyer issued a subpoena with an early return date that, unlike Migdal's subpoenas, directed documents to be delivered to counsel's office (rather than to the court).  *See* 245 F.R.D. at 613.  The government moved to quash the subpoena and argued that Rule 17 subpoenas directing appearance or production other than at trial are improper.  *See id.*  The late Judge Ann Aldrich held that the subpoena "might be technically deficient," but that was not reason enough to quash it.  *Id.* at 601–11.  That Judge Aldrich refused to quash the subpoena, let alone sanction counsel for issuing it, reinforces Migdal's good-faith belief that an early-return subpoena was allowable.

Judge Adams, it is true, told Migdal after the fact that he did not find *Smith* to be "very persuasive" and said that Judge Aldrich's order was "really of little import" to him.  Instead, he relied extensively on the contrary conclusion reached in *United States v. Dyer*, No. 1:00-CR-0062 (N.D. Ohio Aug. 29, 2000), in which Judge Lesley Wells held that a Rule 17(c) subpoena informing a recipient that it can be satisfied by producing documents to counsel before the trial date stated on the subpoena is improper.  Judge Wells further determined that the court must approve early-return subpoenas before they are issued.

But Judge Adams's inclination to side with one judge's view over that of another obscures the point that Migdal did not act in bad faith when she hewed to at least one judge's reading of the controlling rule. And more, Migdal's explanations for her conduct reinforce the view that while Migdal may have made a mistake, she did not engage in purposeful wrongdoing. Migdal conceded that the early-return subpoenas were defective as issued but consistently explained that her purpose was to "avoid a delay in the proceedings." Based on her belief that the pretrial conference scheduled for June 9 would be converted into an evidentiary hearing on her suppression motion, Migdal said again and again that she put an early return date on two subpoenas in order to be prepared for the hearing and avoid asking for a continuance. Knowing how seriously the court takes its schedule, she told Judge Adams, her "motivation was solely not to disrupt" his timetable. Migdal reiterated that she "did not act with any improper motive" or "any intent to misuse the Court's subpoena power." "I respect the Court's authority," she submitted, and "I have never knowingly violated a court order in my career as an attorney and I have no intention of ever doing so."

Critically, the district court's decision to sanction Migdal for issuing defective early-return subpoenas did not turn on a credibility determination. The facts, as the district court found, were undisputed. Instead, the court concluded that Migdal *necessarily* acted in bad faith by placing a date on the subpoenas when she knew no court date was scheduled at that time. Because the record lacks any evidence of bad faith, the district court relied on clearly erroneous factual findings to conclude that Migdal acted in bad faith, and thus abused its discretion in sanctioning her on this ground.

### 3. Pre-issuance approval of Rule 17(c) subpoenas

We turn to the final sanctions ground—namely, the district court's conclusion in its first sanctions order that Migdal "utter[ly] disregard[ed]" Rule 17(c)'s "implicit requirement" that the court "must approve and order early-production subpoenas." While the Sixth Circuit has not addressed whether counsel in a criminal case must obtain court approval before a Rule 17(c) subpoena may issue, we see no need to do so here.

The focus of our inquiry, as we have said, is whether Migdal's failure to get such approval shows that she acted in bad faith. It does not. That said, we rehearse the arguments for and against a pre-issuance-approval rule to help district courts—in whose sound discretion the Federal Rules appear to place this choice—decide the most effective means to manage this aspect of their criminal dockets.

In this case, Judge Adams read the text of Rule 17(c) to require a defendant to get approval from the court before a subpoena may issue. Rule 17(c)(1), the court reasoned, says that "[t]he court may direct the witness to produce the designated items in court before trial or before they are to be offered in evidence." That language alone does not make court approval necessary, Judge Adams conceded, but the next sentence of Rule 17(c)(1) does: that text, he wrote, "makes it clear that to obtain these items before a hearing or trial . . . the Court must review and approve the request so that the *Court* may direct the items to be produced." In order to exercise the discretion the rule contemplates, the court concluded that its approval is required.

Migdal, though, can be forgiven for interpreting Rule 17(c) differently. To begin with, its text is susceptible to an altogether different rendering. Rule 17(c)(3) states that "a subpoena requiring the production of personal or confidential information about a victim may be served on a third party *only* by court order." Fed. R. Crim. P. 17(c)(3) (emphasis added). This subsection further requires the court to give notice to the victim, who may then move to quash or modify the subpoena, or otherwise object to it. *See id.* As Migdal points out, the limiting language that permits certain subpoenas to be served "only" by court order would be surplusage if Rule 17(c) already *required* a district court to approve a subpoena duces tecum before it issued. Reading the rule to require approval in all cases, as the district court did, violates the interpretive canon that cautions against construing statutory language in a way that renders any of it superfluous. *See Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 112 (1991).

On the other hand, Rule 17(c)'s purpose is arguably frustrated without court involvement in a pretrial subpoena. Without pre-issuance approval, the argument goes, a court's ability to exercise its supervisory power to ensure that third-party subpoenas

are used to secure relevant, admissible, and specific evidence would be limited. A party, for example, might not know that the other side issued a subpoena to a third party. Or a party may lack standing to file a motion to quash a subpoena to a third party. *See Langford v. Chrysler Motors Corp.*, 513 F.2d 1121 (2d Cir. 1975) (no standing to object to a subpoena directed at a non-party absent a claim of privilege); *Ponsford v. United States*, 771 F.2d 1305, 1308 (9th Cir. 1985) (no standing to quash a subpoena absent a proprietary interest in the documents sought). The difficulty in these cases is that the court's supervisory responsibilities "hinge solely upon the potential filing of a motion to quash by a *third party* to the case, who often may lack the incentive or the wherewithal to make such a filing." *Beckford*, 964 F. Supp. at 1024. Since any of these situations might subvert Rule 17(c)'s grant of discretion to the district court to supervise the subpoena process, requiring leave of court before an early-return pretrial subpoena can issue is at least arguably desireable.

That said, Migdal could have quite reasonably relied on decisions from the Northern District of Ohio and other jurisdictions that supported her view of the court's noninvolvement. In *Smith*, Judge Aldrich found "no authority for [the] argument that a party must first procure an order of this court before issuing a subpoena under Rule 17." 245 F.R.D. at 610. A hearing on a motion to quash, *Smith* reasoned, provides the best opportunity to challenge the propriety of a subpoena by subjecting it to the requirements of the *Nixon* test, at which time the requesting party can clear the hurdles of relevancy, admissibility, and specificity. *Id*. In *Dyer*, by contrast, Judge Wells saw it differently, holding that court intervention is required when a party seeks to require the production of documents prior to trial. A look to decisions in other jurisdictions reveals similarly divergent views. *See, e.g.*, *Kent v. United of Omaha Life Ins. Co.*, 430 F. Supp. 2d 946, 950 (D.S.D. 2006), *rev'd in part on other grounds*, 484 F.3d 988 (8th Cir. 2007) ("[s]ubpoenas are none of the judge's concern and any practice of asking the judge to approve in advance the issuance of a subpoena . . . has never been the practice in [this district]"); *United States v. Urlacher*, 136 F.R.D. 550, 554–55 (W.D.N.Y. 1991) (observing that the question of "prior invocation of the court's aid when pretrial production pursuant to a subpoena duces tecum is sought" is "not easily answered," and

citing *United States v. Ferguson*, 37 F.R.D. 6, 8 (D.D.C. 1965), for the proposition that Rule 17(c) requires a motion prior to issuance of a pretrial subpoena duces tecum, but noting that "treatises acknowledge . . . that the issue can be raised as well on a motion to quash, a procedure definitely authorized by Rule 17(c)" (internal quotation marks omitted)); *United States v. Beckford*, 964 F. Supp. 1010, 1020–25 (E.D. Va. 1997) (discussing the issue, cataloging the cases, and concluding that "Rule 17(c) requires a motion as the procedural vehicle to secure a pre-trial subpoena duces tecum").

Returning to our task, the question with respect to pre-issuance-approval is not the correctness of the competing conclusions of various courts, but instead whether Migdal acted in bad faith in not seeking it. The record simply does not support a finding that Migdal's issuance of a pre-trial Rule 17(c) subpoena without Judge Adams's approval was meritless, nor that Migdal knew or should have known that it was. *See Aleo*, 681 F.3d at 305. Although the district court issued a standing order after the July 14, 2011 hearing requiring a requesting party to get authorization before seeking a subpoena under Rule 17(c), this rule was not in effect when Migdal issued the subpoenas in question. And as is clear from the discussion above, neither a plain-language reading of the rule's text, nor a rendering of its purpose, nor a review of decisional law unequivocally supports a pre-issuance approval requirement. Given that, the district court abused its discretion in finding that Migdal acted in bad faith when she issued the subpoenas without court approval.

We offer one final note. Although Migdal asks us to provide controlling guidance concerning Rule 17(c) procedures, we decline the invitation. Rule 17(c) is capacious enough to accommodate differing levels of oversight that district courts deem desirable to impose. It commits the task of supervising subpoenas to the sound discretion of those courts, which can determine the appropriate mechanisms for exercising oversight as they see fit—by standing order, local rule, or no rule at all. Here, where resolution of this issue is not necessary, the better course is to honor that grant of discretion by allowing district courts to choose whether the burden of categorically managing the subpoena process is preferable to resolving disputes when they arise.

### III.  CONCLUSION

Because the record does not provide any basis for the district court's conclusion that Migdal's conduct was sanctionable, we **VACATE** the sections of the September 13 order pertaining to sanctions, **REVERSE** the May 3 order in its entirety, and **DISMISS** the sanctions proceeding against Migdal.  This opinion closes the book on a regrettable chapter in Debra Migdal's career, clears her of all claims that her conduct in this matter was sanctionable, and removes any taint of public censure on her reputation.