NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0275n.06

Case No. 24-1614

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| | | **FILED** |
| | | Jun 05, 2025 |
| | | KELLY L. STEPHENS, Clerk |

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

LAVONTE SAMPSON,

    Defendant-Appellant.

)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

O P I N I O N

Before: COLE, READLER, and RITZ, Circuit Judges.

COLE, Circuit Judge. A jury convicted Lavonte Sampson for sex trafficking of children and production of child pornography. Sampson argues the district court erred by denying his motion for a mistrial, motion for a new trial, and request for the victim's mental health records. He also argues there was insufficient evidence to convict him. We affirm.

I.

A.

This case concerns then-36-year-old Lavonte Sampson's sex trafficking of a 15-year-old girl, Jane Doe.[1] Sampson met Doe online. He began messaging Doe, saying that they could "trap

---

[1] The government refers to the minor victim as "MV-1," while Sampson refers to her as "Jane Doe." Because this appeal is about only one minor victim, we use Doe throughout this opinion.

together," which an investigator interpreted as referring to sex trafficking. (Trial Tr., R. 120, PageID 2584–85.) Sampson also requested and received nude pictures from Doe.

One day, Sampson drove to meet Doe in person at Doe's boyfriend's house where Sampson and Doe smoked marijuana. Sampson and Doe left the house and drove to Sampson's mother's house.

Before leaving the car, Sampson asked Doe how old she was. She lied and stated that she was 18 or 19 years old. Sampson said that Doe looked "really young." (Trial Tr., R. 118, PageID 2117.) The two then entered the house, and Sampson did not introduce Doe to his mother because of how young Doe looked.

Sampson took Doe to his bedroom, had sexual intercourse with Doe several times, and, unbeknownst to Doe, filmed their interaction. Over several hours, Sampson kept Doe in his bedroom, instructing her not to leave "[b]ecause he did not want his mom to find out how young [Doe] was by the look of [her] face." (*Id.* at PageID 2133.)

Sampson then drove Doe to a motel. There, Sampson, another man, and another woman took Doe to a room, and Sampson told Doe that she would be having sex with other men for money. Sampson created advertisements using pictures of Doe and began marketing her for commercial sex on an online commercial sex website.

Doe would stay in the room while Sampson arranged men to come have sex with her for money. Sampson set the price, the men paid Doe, and Doe gave the money to Sampson. He arranged for Doe to have sex with more than five men.

The Detroit Police Department and Federal Bureau of Investigation, meanwhile, had been investigating the online advertisements Sampson posted and arrived at the motel. Officers had been informed of a missing minor—Doe—who was potentially being sex trafficked.

The investigation revealed that "potential commercial sex buyers inquir[ed] about [Doe's] age," stating that "[she] look[ed] young." (Trial Tr., R. 120, PageID 2514.) Sampson would respond by saying Doe was a few different ages, ranging from 19 to 24 years old.

Officers contacted the number listed on the advertisements and set up a recovery operation at the motel where Doe was staying. That phone number was Sampson's. In response to an undercover officer's request to set up a date with Doe, Sampson sent a video of him and Doe having sex. Officers coordinated a fake arrest, during which an undercover officer went to the motel for a date with Doe but was ultimately arrested by law enforcement to recover Doe.

A few weeks after officers conducted their fake arrest, investigators approached Doe about Sampson. Doe was initially uncooperative due to experiencing a miscarriage, but she began cooperating with law enforcement as she built trust with the officers. She interviewed with the FBI multiple times, sharing what Sampson had done to her.

B.

A grand jury indicted Sampson on two counts: (1) sex trafficking of children, in violation of 18 U.S.C. § 1591(a), and (2) production of child pornography, in violation of 18 U.S.C. § 2251(a). Sampson pleaded not guilty and proceeded to trial.

Prior to trial, Sampson moved for production of materials pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), and for a Rule 17(c) subpoena. The motions were largely identical, and in each motion, Sampson sought information pertaining to Doe's mental health to impeach Doe. The records Sampson sought came from therapy, counseling, social service providers, Child Protective Services, Detroit Children's Hospital, and the Michigan Department of Health and Human Services. The district court denied Sampson's motions because Sampson failed to establish "any

factual basis suggesting [Doe's] mental health records will contain relevant, exculpatory information, or that [the] records are admissible[.]" (Op. and Order, R. 84, PageID 1087.)

The case proceeded to trial, and Doe testified during the government's case-in-chief. During Doe's testimony on cross-examination, she had an emotional outburst. She cursed at the attorneys and the court, and the court called a brief recess. The parties agreed to restart Doe's testimony the next day.

Before Doe's testimony resumed, however, Sampson moved for a mistrial pursuant to Federal Rule of Criminal Procedure 26.3. As Doe was departing the witness stand, she referred to Sampson by a racial epithet. The transcript does not reflect this part of the incident, as neither the court reporter nor the judge heard Doe use the slur. The district court gave a curative instruction to the jurors, instructing them to disregard Doe's outburst because nothing she said should prejudice the jury against Sampson or his counsel, and permitted Doe to again take the stand.

When testimony resumed, Sampson questioned Doe about being pregnant at the time of these events. At that time, the government asked to approach the bench. The government informed the court and defense that Doe blamed Sampson for her miscarriage, and that probing further into that information would be unnecessary and irrelevant. The court advised the attorneys to "not get so sidetracked," and the cross-examination continued. (Trial Tr., R. 119, PageID 2269.)

After Doe finished testifying, Sampson requested a poll of the jury to determine whether and which jurors had heard Doe utter the slur. Over the government's objection, the district court polled the jury. Four jurors heard the slur, and all confirmed that while they heard Doe's remark, they could remain fair and impartial. One juror who did not hear the slur nonetheless appeared hesitant about her ability to be fair and impartial, so the district court made that juror an alternate.

The district court denied Sampson's oral motion for a mistrial and proceeded with testimony. The district court also denied Sampson's written motion for a mistrial in a written opinion and order. After testimony, Sampson moved for a directed verdict. The district court denied Sampson's motion, and the case was submitted to the jury.

The jury found Sampson guilty of both sex trafficking of a minor and production of child pornography. Sampson moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 and for a new trial pursuant to Rule 33. The district court denied Sampson's motions.

The district court sentenced Sampson to 240 months of imprisonment. Sampson timely appealed.

II.

Sampson challenges his convictions on three grounds. First, he argues that the district court erred by denying his motions for mistrial and for a new trial. Second, he argues the trial court erred by denying his motion for *Brady* material and his request for a Rule 17(c) subpoena. Finally, he argues that there was insufficient evidence to convict him of sex trafficking of children and production of child pornography. We consider each issue in turn.

A.

We review a district court's denial of a Rule 26.3 motion for mistrial or a Rule 33 motion for new trial for abuse of discretion. Fed. R. Crim. P. 26.3, 33; *United States v. Harvel*, 115 F.4th 714, 738 (6th Cir. 2024), *cert. denied*, No. 24-6178, 2025 WL 889192 (U.S. Mar. 24, 2025); *United States v. Dado*, 759 F.3d 550, 559 (6th Cir. 2014) (quoting *United States v. White*, 492 F.3d 380, 408 (6th Cir. 2007)).

Sampson moved for a mistrial after Doe's outburst. He argues the district court should have granted a mistrial for two reasons. First, he argues there were two incidents of false

testimony. Second, he argues that Doe's outburst contained improper statements that impinged upon his right to a fair trial.

Sampson argues that Doe provided false testimony on her access to cellular and internet service while at the motel and her blame of Sampson for her miscarriage, thus depriving him of due process. To demonstrate that false testimony violated a defendant's due process rights, the defendant must show that "(1) the statement was actually false; (2) the statement was material; and (3) the prosecution knew it was false." *Peoples v. Lafler*, 734 F.3d 503, 516 (6th Cir. 2013) (quoting *Brooks v. Tennessee*, 626 F.3d 878, 894–95 (6th Cir. 2010)) (internal quotation marks omitted). "Testimony is material only if there is a reasonable likelihood that it affected the judgment of the jury." *Id.*

Doe's testimony about her cellular and internet access—assuming it was false, as the district court did—was not material. Although providing false testimony would harm Doe's credibility, Sampson does not explain how the falsity of the internet access, specifically, would affect the jury's judgment regarding Sampson's knowledge of Doe's age, his decision to record them having sex, his commercial sex advertisements using her image, and his coordination of adult men to have sex with her. In other words, there is no "reasonable likelihood" that Doe's statement about her internet access at the motel affected the jury's decision to convict Sampson.

Sampson argues that Doe's second incident of false testimony was the withheld information pertaining to Doe blaming him for her miscarriage. He does not explain how this information amounts to false testimony, largely relying on caselaw relating to a district court's ability to vacate a verdict when the jury's decision was against the manifest weight of the evidence. Instead, he speculates that Doe's blame of Sampson would motivate her to lie about Sampson, and he makes a final cursory argument that the government committed prosecutorial misconduct by

failing to disclose that Doe blamed Sampson for her miscarriage. But Sampson fails to address how evidence pertaining to Doe's blame of Sampson for her miscarriage would not severely prejudice him, as it very well could have. Nor does he address how the government's mid-trial disclosure—the day after the government itself learned about Doe blaming Sampson—amounts to misconduct, especially considering the defense received that information during their cross-examination of Doe. (*See* Resp., R. 116, PageID 2023 n.3.) We reject Sampson's cursory arguments. *See United States v. Johnson*, 79 F.4th 684, 706 (6th Cir. 2023) (citing *United States v. Gray*, 692 F.3d 514, 521 (6th Cir. 2012)).

Finally, Sampson argues that the district court erred by denying his motions for a mistrial and a new trial because of Doe's improper statements. We consider five factors to determine whether a witness's improper statements warrant a mistrial:

> (1) whether the remark was unsolicited, (2) whether the government's line of questioning was reasonable, (3) whether a limiting instruction was immediate, clear, and forceful, (4) whether any bad faith was evidenced by the government, and (5) whether the remark was only a small part of the evidence against the defendant.

*United States v. Caver*, 470 F.3d 220, 243 (6th Cir. 2006) (quoting *Zuern v. Tate*, 336 F.3d 478, 485 (6th Cir. 2003)) (internal quotation marks omitted); *United States v. Forrest*, 17 F.3d 916, 920–21 (6th Cir. 1994) (per curiam) (evaluating a motion for mistrial by applying the five factors).

These factors support the district court's decision to deny Sampson's motions for a mistrial or new trial. Because Doe's outburst, foul language, and slur occurred during cross-examination, the first two factors are inapplicable. *See Caver*, 470 F.3d at 245 ("Because the remark occurred on cross examination, whether the government solicited the remark is inapplicable, as is the question of whether the government's line of questioning was reasonable."). As to the third factor, the district court gave a clear limiting instruction immediately after Doe's outburst and did more

by polling each juror about whether they heard her use of the racial slur. After the poll, the district court gave each juror another firm limiting instruction.

There is no evidence that the government acted in bad faith or encouraged this outburst, so the fourth factor also favors the district court's decision. Finally, Doe's remarks—while improper and derogatory towards Sampson—were only a small part of the evidence put forth against Sampson. Other evidence included Doe's testimony about their interaction prior to her being sex trafficked, including the nude photos she sent Sampson and Sampson remarking that she appeared young, Sampson's suggestion that they "trap" together, and Sampson sending the video of him having sex with Doe while recruiting the undercover officer to pay for sex with her.

Although he cites the five factors, Sampson does not argue why they favor granting a mistrial or new trial. Rather, he argues that Doe's derogatory statements prejudiced him in the presence of the jury, warranting a mistrial. While we are primarily concerned with fairness to defendants, we use the five *Forrest* factors to determine whether the witness's statements have impinged on that fairness. 17 F.3d at 919–21. Here, those factors show that the statement did not violate Sampson's right to a fair trial.

For these reasons, the district court did not abuse its discretion by denying Sampson's request for a mistrial or a new trial.

B.

Sampson next argues that the district court erred by denying his pretrial motions for *Brady* material and a Rule 17(c) subpoena, which sought information pertaining to Doe's mental health to impeach her. We consider the denial of each motion in turn.

If the government fails to disclose evidence favorable to a defendant and material to guilt or punishment, it violates that defendant's right to due process. *Brady v. Maryland*, 373 U.S. 83,

87 (1963). The failure to disclose is a violation regardless of whether the government acted in good faith. *Id.* *Brady*'s protections also apply to evidence affecting witness credibility. *Giglio v. United States*, 405 U.S. 150, 153–54 (1972).

As the government here emphasizes, it must disclose such information in its possession. *See United States v. Sherlin*, 67 F.3d 1208, 1218 (6th Cir. 1995) ("*Brady* expressly applies to material evidence withheld from the defense *by the prosecution*."). Before both this court and the district court, the government has represented that it did not have the records Sampson sought. Sampson has provided no reason for us to disbelieve the government's representations. Rather, those records were, presumably, possessed by the various non-federal agencies and entities Sampson himself identified in his *Brady* motion and his motion for a Rule 17(c) subpoena, such as social service providers, Child Protective Services, and the Michigan Department of Health and Human Services.

The district court similarly did not err by denying Sampson's request for a Rule 17(c) subpoena to access Doe's mental health records. To obtain records via a Rule 17(c) subpoena, the requesting party must show that the requested information is "relevant, admissible, and specific[.]" *United States v. Llanez-Garcia*, 735 F.3d 483, 498–99 (6th Cir. 2013); *United States v. Hughes*, 895 F.2d 1135, 1145–46 (6th Cir. 1990).

Although Sampson sought this information because he intended to use it as impeachment evidence, he does not explain how the requested information satisfies each Rule 17(c) requirement. Rather, he speculates that Doe's outburst at trial suggests that she suffers from a mental disorder or other emotional issues which would support his request for her mental health records. He also argues that the records could have been used to impeach her prejudicial statements against

Sampson. These arguments are speculative and conclusory. Sampson does not identify any specific admissible or relevant record he sought via the Rule 17(c) subpoena.

Therefore, the district court did not abuse its discretion by denying Sampson's request for Doe's mental health records.

C.

Lastly, Sampson argues that the district court erred by denying his Rule 29 motion for judgment of acquittal because his convictions were not supported by sufficient evidence. *See* Fed. R. Crim. P. 29. "We review challenges to the sufficiency of the evidence de novo[,]" and we must affirm the conviction "'if any rational juror could have voted to convict.'" *United States v. Jakits*, 129 F.4th 314, 322 (6th Cir. 2025) (quoting *United States v. Latimer*, 16 F.4th 222, 225 (6th Cir. 2021)). While conducting this analysis, "we view the evidence in the light most favorable to the government[.]" *Id.*

Sampson's challenge to his conviction for production of child pornography fails. To obtain a conviction of production of child pornography, the government must prove beyond a reasonable doubt that, in or affecting interstate commerce, the defendant "employed, used, persuaded, induced, enticed, or coerced any minor to engage in . . . any sexually explicit conduct for the purpose of producing any visual depiction of such conduct[.]" 18 U.S.C. § 2251(a) (verb tense altered). Sampson contends that he did not have the required intent.

The evidence shows otherwise. Sampson told Doe that they could "trap" together, which the government's investigator interpreted as referring to sex trafficking for money. Sampson requested and received nude pictures from Doe. And while having sex with her, Sampson secretly recorded Doe. He later used that video to entice the undercover officer to pay for sex with Doe.

Viewing these facts in a light most favorable to the government, a reasonable juror could infer that Sampson had the requisite intent to produce a visual depiction of sexually explicit conduct.

Sampson's arguments to the contrary are unpersuasive. He argues that the evidence did not show he had sex with Doe in order to produce a video, stating he "took a single short video of he and [Doe] having sex." (Appellant Br. 33.) Below, he argued that "this was a sex act for sexual gratification only, not for the production of a video." (Trial Tr., R. 120, PageID 2615.) But his actions could have had several motivations, and a conviction for production of child pornography will stand even where one of the motivating factors was his intention to produce a video. *See United States v. Frei*, 995 F.3d 561, 566 (6th Cir. 2021) ("[Section] 2251(a) contains no language that requires the defendant to sexually engage with the minor for the *sole* purpose of producing visual depictions."). Even if sexual gratification were one of the reasons he recorded the video, given the facts about Doe's communications with Sampson prior to having sex with him, as well as Sampson's use of Doe's images and video for commercial sex advertisements afterward, a reasonable juror could also infer that Sampson had sex with Doe in order to produce explicit content of her.

Sampson's challenge to his conviction for sex trafficking of a minor similarly fails. A conviction for sex trafficking a minor requires the government to prove, beyond a reasonable doubt, that the defendant, in or affecting interstate commerce, knowingly "recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, or solicited" a minor, or that the defendant knew or "recklessly disregarded" the fact that the person was a minor and would be caused to engage in a commercial sex act. 18 U.S.C. § 1591(a) (verb tense altered). But if "the defendant had a reasonable opportunity to observe the person so recruited, enticed, harbored, transported, provided, obtained, maintained, patronized, or solicited, the Government

need not prove that the defendant knew, or recklessly disregarded the fact, that the person had not attained the age of 18 years." *Id.* § 1591(c). Sampson challenges his conviction for trafficking on knowledge grounds, claiming that he did not know or recklessly disregard Doe's age and that he did not have a reasonable opportunity to observe her.

Sufficient evidence was presented to the jury such that a reasonable juror could have found that, at a minimum, Sampson had a reasonable opportunity to observe Doe. Doe testified that Sampson told her she appeared young and refused to let her out of his room when his mother was in the house because he did not want his mother to see how young Doe appeared. Doe testified that she spent several hours at Sampson's house, had sex with Sampson "a couple times," and that Sampson tattooed her lower back. (Trial Tr., R. 118, PageID 2121–22, 2135.) Given the significant time that Sampson spent in close proximity with Doe, he had a reasonable opportunity to observe her.

Accordingly, sufficient evidence supported each of Sampson's convictions.

### III.

For these reasons, we affirm the district court's judgment.